UNITED STATES, Appellee,

v.

Lawrence J. KOOPMAN, Personnelman
Seaman Apprentice U. S.
Navy, Appellant.

No. 47,106.

NMCM 82 5296.

U.S. Court of Military Appeals.

May 28, 1985.

For Appellant: *Lieutenant Roman A. Chojnacki*, JAGC, USNR (argued); *Lieutenant Colonel M. W. Lucas*, USMC, and *Lieutenant Philip J. Shebest*, JAGC, USNR (on brief); *Lieutenant Commander David S. Durbin*, JAGC, USNR.

For Appellee: *Lieutenant P.J. Battin*, JAGC, USNR (argued); *Lieutenant Joseph*

J. *Portuondo*, JAGC, USNR (on brief); Captain *W. J. Hughes*, JAGC, USN, *Lieutenant P.J. Pfeiffer*, JAGC, USNR, *Lieutenant Michael P. Cogswell*, JAGC, USNR.

### Opinion of the Court
EVERETT, Chief Judge:

#### I

On July 29, and August 2–3, 1982, a military judge sitting alone as a general court-martial at the Norfolk Naval Base tried appellant on three charges. The 11 specifications of Charge I alleged these unauthorized absences, in violation of Article 86, Uniform Code of Military Justice, 10 U.S.C. § 886:

1.  July 7–14, 1980
2.  July 14–15, 1980
3.  July 15–18, 1980
4.  July 18–20, 1980
5.  July 30—August 3, 1980
6.  August 3–4, 1980
7.  August 17–21, 1980
8.  August 21—September 4, 1980
9.  December 1–10, 1980
10. December 20, 1980—March 4, 1981
11. August 19, 1981—April 6, 1982

Charge II contained 42 specifications, half of which asserted that, "with intent to defraud," appellant made checks to the Navy Exchange at Norfolk, and the other half asserted that he uttered these same checks, all "then knowing that he ... did not or would not have sufficient funds in or credit with" the "bank, for the payment of said check ... upon presentment." These offenses violated Article 123a, UCMJ, 10 U.S.C. § 923a. All these checks were written between June 21, 1980, and July 10, 1980; and their aggregate face amounts totaled $2,483.47. Charge III concerned dishonorable failure to pay a debt of $256.93 owed to the Navy Lodge at Little Creek, Virginia.

The military judge dismissed Charge III because of the running of the statute of limitations [1]; acquitted appellant of the first three specifications of Charge I; and convicted him of all the remaining charges and specifications. He adjudged a sentence of a bad-conduct discharge, confinement at hard labor for 2 years, total forfeitures, reduction to the lowest pay grade, a fine of $2500.00 and further confinement until the fine was paid but for no more than 1 additional year. The convening authority approved the findings and sentence; and the Court of Military Review affirmed in an unpublished opinion.

The issue on which this Court granted review (18 M.J. 88) relates to the military judge's denial of a defense motion to dismiss the first ten specifications of unauthorized absence—all but the absence from August 19, 1981—April 6, 1982—and all 42 specifications of Charge II. This motion relied on promised immunity from prosecution and claimed that appellant had reached an understanding with the staff judge advocate that, if he made a good-faith effort to pay the worthless checks, he would not be prosecuted for the check offenses, and the first ten unauthorized absences alleged in specifications 1 to 10 of Charge I would be referred to a summary court-martial.

#### II

In the summer of 1980, Lieutenant Commander Andrew McKay, who was then the legal officer at the Naval Regional Medical Center at Portsmouth, Virginia, became aware that Koopman had written a number of bad checks at the Navy Exchange and also had been absent without authority on several occasions. At that time appellant was attached temporarily to the Medical Holding Company at the Medical Center. "He was from the USS BLANDY" and was at the Center in connection with an operation on his nose.

> When the bad checks came in, ... the main thing the command was concerned about was getting the checks paid back .... In the September time frame, when Koopman was placed in confinement, we had received assurances that the money would be paid back. We had received a

1. The court-martial order fails to reflect this action.

number of different explanations on where the money was coming from from [sic] Koopman, who had told us that things about inheritance, about a bad check from his uncle which was cashed which caused his to be bounced, a whole series of different things which we did check out.

As part of the collection endeavors, McKay agreed with appellant and his defense counsel, Lieutenant Jae Jones, that if all the checks were paid off, the worthless-check offenses would be handled by nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815. In order to allow appellant ample opportunity to obtain the funds for payment, the charges of making bad checks, which were referred to a special court-martial on October 22, 1980, were scheduled to be tried on December 29, 1980. After 65 days of pretrial confinement, Koopman was released from confinement on November 12, 1980—the same day on which the scheduling of his trial took place; but on December 1st, he absented himself without authority for ten days. After five more days of pretrial confinement, he was released on December 16, 1980; and thereupon he absented himself again, the absence terminating with his apprehension in Louisiana.

Additional charges were preferred to encompass the new unauthorized absences; and once again, negotiations took place between Lieutenant Commander McKay, Koopman, and his counsel, Lieutenant Jones. In May, 1981, it was agreed that if Koopman paid all the checks, then the charges against him would be disposed of by summary court-martial, rather than by a special court-martial. In the alternative, a pretrial agreement was entered into concerning disposition of the charges by special court-martial if appellant were unable to pay off the checks. At this point, some delay in trial occurred because of the loss of appellant's service record book and the need to replace it in order for the Government to prove the unauthorized-absence offenses.

The end of Koopman's obligated service was approaching in July, and both the commander of the Medical Center and Lieutenant Commander McKay, its legal officer, were scheduled for reassignment early in that same month. McKay apparently became increasingly anxious to dispose of the charges; and the terms offered to Koopman became ever more generous. Thus, it was proposed that if appellant "paid off most"—rather than all—of the checks, then the pending charges would be disposed of by summary—rather than special—court-martial. Appellant paid $500 on June 15, 1981; and he begged Lieutenant Commander McKay not to "go forward with the court-martial." McKay responded that Koopman had until July 8th or 9th to close things out, since McKay would be departing for a new station on July 10th. Thereafter, appellant would have to deal with a new staff judge advocate, as well as a new convening authority; and the terms of an agreement with them might be harsher. The total of the checks owed was around $2,700—which apparently included a $10.00 service charge by the Navy Exchange for each check—and the command's primary interest was in getting these checks paid to the Navy Exchange. McKay's final agreement "with Koopman was that if he paid off most of the money" owed—by which McKay meant around $2,000,—the bad-check charges would be dropped entirely "and the unauthorized absence offenses ... would be referred to a summary court-martial."

When Lieutenant James Harrington succeeded Lieutenant Commander McKay as legal officer for the Medical Center, he continued negotiations with a view to obtaining payment of the dishonored checks. As Harrington recalled his understanding with appellant, if Koopman paid "most" of the checks, then all the charges—including the bad-check offenses—would be referred to a summary court-martial.

On August 5, 1981, Koopman's case was scheduled to be tried three weeks later. However, on August 12—shortly after Koopman had paid another $700.00 on the bad checks—the charges were withdrawn

from a special court-martial with a view to referring them to a summary court-martial. At this point, the plan was that Koopman, who had served his enlistment, would be discharged and his accrued leave pay would be applied to payment of the remaining bad checks. According to the testimony of Lieutenant Jones, who was representing appellant at this time, Koopman was required to make "a good faith effort," even if the funds available upon his discharge might not completely suffice to pay all the checks.

On the evidence before him, the military judge found:

that as of 12 August 1981, there existed an agreement between the accused and the government. First, in return for restitution of a substantial portion of the sum of approximately $2750.00 to the Navy Exchange, the convening authority, that is, Commander, Naval Regional Medical Center, Portsmouth, Virginia, would withdraw the offense[s] then before a special court-martial and refer them to a summary court-martial. Secondly, that the restitution was to be made in cash payments totaling $1200.00 and the balance to be obtained from the final Navy pay to the accused immediately prior to his discharge. Third, that the accused made restitution of $1200.00 in reliance upon this agreement. Fourth, that the convening authority withdrew the charges from a special court-martial for referral to a summary court-martial based on the accused's restitution.

On August 19, 1981, appellant once again absented himself from his unit without authority and remained away until April 6, 1982. After this absence ended, action was taken to have Koopman tried by general court-martial on all the pending bad-check and unauthorized-absence charges, as well as the most recent absence. The military judge determined that, despite the August 12 agreement, this action was permissible, because he found:

fifth, that implicit in the agreement was the understanding that the discharge of the accused and the resulting final payment in restitution was to occur within a reasonable period of time after the 12th of August 1981; sixth, that as a result of the accused's actions his discharge was not effected within a reasonable period of time after the 12th of August 1981; and seventh, that accordingly, the accused did not fulfill his obligation under the terms of the agreement; and finally, of course, that the government is no longer bound by the agreement at this time.

### III

■ This Court has never hesitated to enforce oral promises of immunity, so long as they were made by an authorized official. *See United States v. Brown*, 13 M.J. 253 (C.M.A. 1982); *Cooke v. Orser*, 12 M.J. 335 (C.M.A. 1982). Under the circumstance of this case, it seems clear that Lieutenant Commander McKay and Lieutenant Harrington, as the convening authority's legal representatives, had been authorized by their respective commanders to make whatever arrangements with appellant that seemed appropriate in order to obtain restitution for the Navy Exchange.[2]

Often pretrial agreements involve an undertaking by the accused to enter certain pleas in return for promised action by the convening authority in his review of the case. Under such circumstances we have held that the convening authority may withdraw from the agreement as long as it is completely executory at the time of his withdrawal. *Shepardson v. Roberts*, 14 M.J. 354 (C.M.A. 1983). While here a different type of pretrial agreement is involved, we see no reason to apply a different principle. Koopman made a payment of $500.00 on June 15, and additional payments of $300.00 and $400.00 on August 10 and 11. Even though there was some uncertainty at trial about the terms of the

---

**2.** Perhaps these officers and the convening authorities would have been more concerned with punishment of the bad-check offenses if Koop-

man had been regularly assigned to the Medical Center, instead of only being temporarily attached to the Holding Company.

various understandings with appellant and these understandings were modified as circumstances changed, it appears that Koopman's three payments to the Navy Exchange were made in reliance on assurances given by Lieutenant Commander McKay and Lieutenant Harrington. Each of these officers was serving at the time as the convening authority's legal representative and had both actual and apparent authority to give these assurances. Moreover, the command received a much desired benefit—reduction of the amount owed by Koopman to the Exchange.

■ Even though appellant had a preexisting duty to pay the checks which he uttered, in the present context this does not preclude these payments from creating a binding obligation on the part of the command.[3] This obligation was subject, however, to certain reciprocal obligations and conditions to be fulfilled by appellant. According to the military judge's findings, one such condition was "that the discharge of the accused and the resulting final payment in restitution was to occur within a reasonable period of time after the 12th of August 1981." Our review of the record reveals no specific testimony that any such condition was discussed, and, in light of this omission, appellant would contend that the condition should not be implied, because it is up to the Government to specify any conditions applicable to a pretrial agreement. *Cf. United States v. Dawson*, 10 M.J. 142 (C.M.A. 1981) (post-trial misconduct provision). We note, however, that it is customary in military law for an accused and his counsel to propose the terms of a pretrial agreement—generally, in writing—so the failure to state a specific deadline for performance cannot be laid solely at the Government's door.

■ Admittedly, pretrial agreements in criminal cases are not always governed by ordinary rules of contract, "since constitutional standards require more than contract principles." *Virgin Islands v. Scotland,*

614 F.2d 360, 364 (3d Cir. 1980); *see United States v. Kazena*, 11 M.J. 28, 34 (C.M.A. 1981) (Everett, C.J., concurring in the result). However, no wholesale rejection of contract law has occurred in the judicial consideration of these agreements. Instead,

> [b]oth before and since *Santobello* [*v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)] the courts have understandably drawn heavily on the ready analogies of substantive and remedial contract law to supply the body of doctrine necessary to order plea bargaining practices and to afford relief to defendants aggrieved in the negotiating process. To the extent therefore that there has evolved any general body of "plea bargain law," it is heavily freighted with those contract law analogies.

*Cooper v. United States*, 594 F.2d 12, 15–16 (4th Cir. 1979).

■ Just as in a commercial contract, certain terms may be implied in an agreement between the prosecution and the defense as to the disposition of criminal charges. In our view the military judge correctly concluded that implicit in the agreement between Koopman and Lieutenant Harrington was a term that appellant make restitution "within a reasonable period of time after the 12th of August 1981." *Cf.* Uniform Commercial Code § 2–309(1). Another implicit term was that the parties act in "good faith" to accomplish the objectives of the contract. *Cf.* Uniform Commercial Code, § 1–203.

■ Pursuant to the understanding with Koopman, on August 12, 1981, the charges against him were removed from the docket of cases that had been scheduled for trial by special court-martial. The parties were contemplating that appellant, who already had passed the end of his term of obligated service, would be promptly discharged and the accrued-leave pay due to him at that time would be applied on the indebtedness.

---

3. Whether performance of a preexisting duty constitutes consideration for a contract is a subject over which legal scholars may dispute, but for purposes of the enforceability of a pretrial agreement in a criminal case, we do not consider such technicalities to be material.

By departing on August 19, 1981, for an unauthorized absence of almost 8 months, appellant assured that his discharge would be substantially delayed and that restitution to the Navy Exchange would not take place promptly. Indeed, during oral argument, appellate defense counsel conceded—and appellate government counsel confirmed—that if, as a result of his lengthy unauthorized absence, appellant were tried for that misconduct and a punitive discharge adjudged, then the accrued-leave pay on which Koopman purportedly was relying for restitution would not be available. In short, appellant's conduct in absenting himself without authority was the antithesis of the "good faith" which was an implicit requirement of the agreement and on which emphasis had been placed by the Government in the lengthy negotiations between appellant, his defense counsel, and the legal representatives of the concerning authority.

The rationale of the trial judge was correct. By his own conduct, appellant committed a breach of the agreement he had entered into with the Government; as a result, the Government was released from performing the August 12th agreement. Therefore, his trial by general court-martial for these offenses was permissible.

## IV

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judge FLETCHER did not participate.

COX, Judge (concurring):

I concur. I would, however, adopt a simple rule that any pretrial agreement between the Government and an accused is breached by the accused when his subsequent misconduct gives rise to an additional charge under the Uniform Code of Military Justice.