UNITED STATES, Appellee,

v.

George F. KIMBLE, Technical
Sergeant, U.S. Air Force,
Appellant.

No. 65,053.
ACM 27680.

U.S. Court of Military Appeals.

Argued March 13, 1991.

Decided Sept. 26, 1991.

For Appellant: *Major Bernard E. Doyle,
Jr.* (argued); *Lieutenant Colonel Jeffrey
R. Owens* (on brief); *Major Ronald G.
Morgan.*

For Appellee: *Captain Morris D. Davis*
(argued); *Lieutenant Colonel Brenda J.
Hollis* (on brief); *Major Paul H. Black-
well, Jr.*

*Opinion of the Court*

EVERETT, Senior Judge:

In a contested general court-martial, ap-
pellant was convicted by officer and enlist-
ed members of two specifications of com-
mitting indecent acts on his younger
daughter and sentenced to confinement for
4 years and reduction to the lowest enlisted

grade.[1] The convening authority approved these results, and the Court of Military Review affirmed. 30 MJ 892 (1990).

We granted appellant's petition to review these two issues:

## I

WHETHER APPELLANT WAS DENIED DUE PROCESS OF LAW BY THE INDUCEMENT OF INCRIMINATING EVIDENCE FROM HIM PURSUANT TO THE STATE'S DECISION TO DEFER PROSECUTION AND A *DE FACTO* GRANT OF IMMUNITY FROM THE UNITED STATES.

## II

WHETHER APPELLANT WAS DENIED THE RIGHT TO CONFRONTATION OF THE WITNESSES AGAINST HIM BY ADMISSION OF THE HEARSAY STATEMENTS OF HIS DAUGHTER.

We agree with appellant's claim of immunity and, so, will order the charges dismissed. Accordingly, we need not address the second issue.

## I

The first specification of which appellant was convicted was based on committing an indecent act with his younger daughter in April 1987. The offense came to light a few months later, based on a tip from a friend of appellant's older daughter. Although both appellant's younger daughter and his wife denied it, appellant ultimately admitted the act to a social worker. As a result of his admission, appellant received counseling and was permitted to remain with his family.

One evening over a year later—on June 15, 1988—appellant's neighbor learned from the girls that appellant was "doing it again" and that, "around Christmas, it [had] started again." She took the girls to her house and went to find appellant and his wife at a local casino. There, she told appellant's wife what she had learned, and the two returned to the family home, leaving appellant at the casino.

Apparently, appellant's wife reported the matter to the civilian authorities late that night. About 1:00 a.m., she also contacted Chief Master Sergeant Wilson, who was appellant's reporting official and a good friend of the family, and told him generally about the problem. Wilson immediately telephoned Major Trent, appellant's squadron commander, and met him at work at 5:00 a.m. There, Wilson told Trent the general nature of the accusation; and, after about an hour's conversation, they decided to let the civilian police and social service agencies handle the matter.

About 7:30 or 7:45 a.m., Wilson arrived at appellant's home; spoke briefly with appellant's wife; got some clothes from her; and took appellant to Wilson's house, where appellant lived the next couple of months. There, Wilson asked appellant what had happened. The conversation was informal, friend-to-friend; no rights advisement was given; and Wilson put no pressure on appellant to answer. Appellant told Wilson about what happened the night before and mentioned as well, the incident in April 1987, but no other incidents came up at all. Wilson explained what happened then:

> Throughout the day, I continually kept Major Trent briefed, updated. He, in turn, kept Colonel Jones[, the special court-martial convening authority,] updated, and throughout that day and the next day the decision was rendered from Colonel Jones that he was going to go along, he was going to go along, defer, to what civilian authorities were going to do, because Metro [the police] and Social Services had gotten involved. We were going to let civilian authorities handle it.

At this point, it is clear that Sergeant Wilson, Major Trent, and Colonel Jones all operated on the belief that only two inci-

---

1. Since trial, the Air Force has administratively discharged appellant from the service, using as a basis for this action the same acts that underlay the court-martial.

dents had occurred—one in April 1987 and one on June 15, 1988.

These events automatically triggered a review of appellant's security clearance. Major Trent arranged for a psychiatrist, Dr. Master, to examine and evaluate appellant at government expense, to help the government determine whether appellant should retain or lose his clearance. Dr. Master first saw appellant on June 21, 1988, and on that date wrote his first report for the command:

> George is accused of sexual assault on April, age 12½ (born in November, 1975). He states that the first incident that occurred was in April, 1987 ... George, on advice of Gurthie Polk, social worker with Nevada Social Services, went to Charter Counseling on Flamingo where in late July/early August of 1987 he was seen three times by a lady therapist whose name he cannot remember. He states the therapist felt the problem was solved, and so therapy was ended. *He states everything was fine until February of 1988 when he again began touching April in the genital area. He did this on several occasions, with the last incident being on the afternoon of June 15, 1988.*

(Emphasis added.) On the basis of Dr. Master's assessment that appellant would be best off at work and that he was not a threat to security or to anyone, the command retained appellant's clearance, and appellant returned to his normal duties a few days after Dr. Master's report was received.

About this same time, the civilian prosecutor agreed to hold in abeyance any formal action against appellant for a year on condition that appellant enter and complete the Las Vegas Child Sexual Abuse Treatment Program (CSAT). As a predicate to entering the program, appellant completed the CSAT intake questionnaire on June 27. According to Dan Bixler, a licensed marriage and family therapist and the clinical coordinator for the Las Vegas CSAT, appellant candidly acknowledged on the form that he had "molested his daughter during

two periods of time. One time in April 1987, *and from January 1988 to 15 June 1988.*" (Emphasis added.)

About a week and a half after he had returned to work, Major Trent advised appellant that Colonel Jones had decided to let the civilian authorities handle the situation and "that no court-martial action would take place provided that he successfully completed his program downtown."

On July 7, appellant actually saw Mr. Bixler for the first time. During their session and in response to Bixler's questions about appellant's answers on the questionnaire, appellant fully explained the April 1987 incident and its repercussions: "George Kimble then told me that, 'It started up again with regularity in January 1988.' ... George Kimble stated that during January 1988 through 15 June 1988, he molested April an average of twice a week, but not every week, in the Kimble's living room and the son's bedroom."

Colonel Jones retired on August 1, 1988, and Colonel Tilley succeeded him as appellant's special court-martial convening authority. Soon thereafter, Colonel Tilley decided to review the status of appellant's case, and he requested the Office of Special Investigations (OSI) to look into the matter.

On August 11, Wilson asked appellant to accompany him to the OSI office because "the OSI wanted to have an interview with him." Before the appointed hour for the interview, Wilson met appellant and his wife at a restaurant near the OSI office. According to Wilson:

> We sat around and had some coffee, and I tried to convey to George that I felt that this was no threat to him going in and having this interview with Agent Viskoc. That it was my perception that they wanted to get the facts from George—because up until that point, I don't think that OSI had even talked to George yet—to get the facts from George for higher headquarters' information.
>
> Q [MJ]: So you informed him that that was your perception, is that correct?
> A: Yes sir.

Q: Did you tell him that there would in fact be no criminal prosecution?

A: No sir. I did try to convey that to him, because Sue was very upset. In fact, she was crying.

Q: Well, let me address that. That is Mrs. Kimble?

A: Mrs. Kimble, yes sir. In fact, I can remember very clearly Mrs. Kimble, making the statement, "Why don't they just let, leave us alone and let us get on with our lives?" And I, as I said, I did not feel that this interview was any kind of a threat. That's why [sic] I tried to convey to George. George made the statement right there, "Well, I'll tell them whatever they need to know."

Q: Let me further define the question. Did you tell him the interview with OSI would be for the sole purpose of making determination of his security status, or did you tell him that it was your perception that it would not have any criminal repercussions?

A: Sir, I do not, I do not believe that I tried to lead Sergeant Kimble to anything other than that it might affect his security clearance, in trying to put him at ease in conducting this interview with Agent Viskoc. I did not try to lead him to believe, nor did I think that it was going to lead to prosecution.

\* \* \* \* \* \*

Q: And, from what I understand from your comments is, it was your perception that it was just an administrative type discussion?

A: Yes sir.

Q: And, you informed him that, you felt that it was an administrative type discussion. Is that correct?

A: My belief, yes sir.

During the interview and after being advised of his rights under Article 31, UCMJ, 10 USC § 831, appellant fully confessed to the sexual abuse of his daughter, but he declined to make a written statement. Al-

though his confession to the OSI was not offered against him at trial because his counsel had not been notified of the interview, Major Trent did testify that the OSI report of the interview was the basis for the decision to prefer charges against appellant several months later. As he explained:

Q [MJ]: What was the difference in the information [in June versus December, when the charges were preferred]?

A: As Colonel Jones and myself had understood it, there had been two occasions of the alleged charges. One a year previous to the one that had occurred on June 15th, so we thought that we were dealing with only two incidents.

Q: As opposed to from January 88 to June 89 [sic], perchance being multiple?

A: Yes sir.

Q: Multiple instances, is that what you're saying?

A: Yes sir.

## II

Of course, charges ultimately were preferred and were referred to a general court-martial. At appellant's arraignment,[2] civilian defense counsel moved, among other things, to suppress any evidence concerning appellant's statements to Mr. Bixler. Though not set out with model precision, his theory was that such statements were made pursuant to a civilian diversionary program that appellant's military commanders expressly had embraced in lieu of court-martial and that, accordingly, the statements that had been made as part of that program could not be used in this court-martial that had resulted from what amounted to a change of heart by a successor commander.

After hearing evidence on the motion, the military judge entered several findings of fact:

---

**2.** This record of trial does not comply with RCM 1103(b)(2)(D)(i), Manual for Courts–Martial, United States, 1984. Because of our disposition, there is no need to correct the record. *Cf.*

*United States v. McCann,* 23 MJ 410 (CMA 1987). Military judges should insure compliance with this RCM prior to authentication of the record.

MJ: ... I have before me a defense motion to suppress certain statements made by the accused to a Mr. Bixler, a clinical therapist. Determining this motion, I've made the following findings. One, on the 16th of June, 1988, investigation into the current charges was initiated by the Las Vegas Metropolitan Police Department, the LVMPD. Two, on 17 June 1988 the accused met with Chief Master Sergeant Wilson, went to the LVMPD. This time the accused had not talked to the police, and subsequently retained a Mr. Benson to represent [sic]. Three, Mr. Benson subsequently negotiated an informal agreement with the District Attorney's office for what was essentially a diversionary proceedings, under the the [sic] terms as set forth in Appellate Exhibit VI. One of the terms required that the accused get counselling to correct his problem. Four, authority for such referral to such agencies to "correct his problem" is contained in Appellate Exhibit V [§ 200.5081, Nevada Revised Statutes], which was provided by defense counsel. *Five, Colonel Jones, upon the recommendation of Major Trent, determined that the offenses were in the hands of civilian courts, and that it would remain in the hands of the civilian courts, be it a felony trial or diversionary procedure. Further, that no court-martial action be taken against the accused upon the facts as known to him. Sixth, that determination was relayed to the accused by both Major Trent and a Chief Master Sergeant Wilson, the accused's immediate supervisor, in late June 1988. Seventh, the accused was informed by Chief Master Sergeant Wilson the program required his attendance at all therapy sessions that had been ordered as a result of the diversionary proceedings. Eighth, the accused was subsequently referred, by the state welfare, to Mr. Bixler's organization for treatment.* Nine, Mr. Bixler related that the accused was in a hurry, that this was an unusual referral, because as opposed to the normal mail posting times, the accused showed up, picked up a packet, filled it out, and returned it to them himself.

He further related *that the accused indicated to him that he did not want the military to prosecute him, and that he was in a hurry to complete the program so that the district attorney wouldn't prosecute.* Ten, the admissions, or confessions, to Mr. Bixler, is what is sought to be suppressed at this time. Eleven, Mr. Bixler is not in the category of those required to advise the accused of Fifth Amendment or Article 31 rights, and was not acting in any capacity as an instrumentality of the United States Air Force nor the military.

(Emphasis added.)

Upon these findings, the military judge then analyzed and ruled upon the legal issues as he saw them:

First, we must determine, was this a promise of immunity, defacto or otherwise, from military prosecution? I find not. The case was in the hands of civilian authorities at that time, and that the communications to the accused as to the intent to leave it in the civilian authorities' hands was an expression from the accused's chain of command that it was satisfied to allow the civilian authorities to handle the case from what they knew about the case. Additionally, it should be noted that Colonel Jones was not the general court-martial convening authority, nor is there any evidence that he was acting with any knowledge or authority of the general court-martial convening authority.

Secondly, did the communications to the accused constitute an unlawful inducement or influence such as to render the confession involuntary? As to this issue: One, there is no evidence that the communications to the accused were to encourage or induce him to make any self-incriminating statements to the counselor, or otherwise to trick or deceive him into incriminating himself. Secondly, the counseling was required under the conditions of the diversionary proceeding for

the accused to complete the diversionary proceedings and to expunge the charges from the civilian files. Third, the accused voluntarily participated in the program, and from the statements from Mr. Bixler, was attempting to accelerate the program in a hurry, so that the civilian authorities would not subsequently prosecute him for felonies. Fourth, the motivation of the accused was to escape state prosecution.

I find that the communications to the accused as to the thought process or intent of his chain of command were not unlawful inducement or influence. By a preponderance of the evidence, I find that his statements were voluntary, and are admissible under Military Rules of Evidence 304.

### III

In the Court of Military Review, appellant cited *Cooke v. Orser,* 12 MJ 335 (CMA 1982), and claimed "that he was denied due process under the Fifth Amendment in that he enjoys the functional equivalent of a grant of immunity." After summarizing appellant's rationale, the court rejected it, reasoning:

We are stubborn and unyielding in our determination to enforce the Rule of Law. As we indicated in [*United States v.*] *Spence,* [29 MJ 630 (AFCMR 1989),] if the Air Force effectively promises an individual that he will not be prosecuted, we will enforce that promise; "the Air Force cannot break its word." *Spence,* 29 MJ at 637. Here, however, the situation is far different, and we find that the appellant's rights were not violated. It is also of some significance that the United States was not a party to any agreement between the appellant and Nevada authorities. However, far more germane to our holding is the fact that the appellant did not deal forthrightly with the Government. The Air Force, prior to August 1988, lacked crucial facts about the appellant's sexual conduct with his daughter. It follows that the Air Force officials never made a *knowledgeable*

election to forego prosecution. The military judge's extensive findings of fact on this matter accurately portray what occurred. We will not disturb them.

30 MJ at 895 (footnote omitted).

### IV

#### A

■ The first issue confronting us is, what is the nature of the promise made to appellant by Colonel Jones through Major Trent and Chief Master Sergeant Wilson?

Major Trent's testimony, supported by that of Chief Master Sergeant Wilson, makes crystal clear that the promise conveyed to appellant was that the command was satisfied to leave the matter in the hands of the civilian authorities and that "no court-martial action would take place provided that he successfully completed his program downtown." Moreover, Wilson specifically advised appellant that part of that program was to comply with all therapy required thereunder. Appellant not only sought to undertake full compliance with that program (and, as far as we know, continued his compliance); he did so with zeal, according to the testimony of Mr. Bixler.

The military judge found—a finding of fact with which the Court of Military Review agreed and which is "fairly supported by the record," *see United States v. Burris,* 21 MJ 140, 144 (CMA 1985), quoting *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983), in turn quoting 28 USC § 2254(d)(8)—that Colonel Jones' promise was based "upon the facts as known to him." Major Trent testified that among these "facts" was a belief that the case involved only two isolated incidents, over a year apart.

Accepting this claim of limited knowledge as fact, which the military judge's findings impliedly do, we conclude that it is irrelevant to the legal issue regarding repercussions flowing from the promise. The command promised appellant *de facto* immunity from court-martial solely on the condition that he successfully undertake

the diversionary program. Appellant did all that was required of this condition, including being entirely open and frank with Mr. Bixler as to the scope of his misconduct. Now, it is time for the Government to comply. *See United States v. Koopman*, 20 MJ 106 (CMA 1985); *Cooke v. Orser, supra*.

Before leaving this aspect of our discussion, however, we must comment on four lingering matters.

■ First, the military judge found as fact, based on Mr. Bixler's testimony, that appellant had accounted for his haste to enroll in the program by explaining to Bixler "that he did not want the military to prosecute him, and that he was in a hurry to complete the program so that the district attorney wouldn't prosecute." There is no evidence in the record that controverts this finding of appellant's dual motivation to participate in the program. Accordingly, when the military judge subsequently noted in his legal ruling that "the motivation of the accused was to escape state prosecution," he erroneously ignored the fact that appellant also was motivated by a desire to escape *military* prosecution—as he had been promised.[3]

Second, though not of decisional importance, we cannot pass on without observing that the command's mistaken belief as to the scope of appellant's misconduct was due to its own negligence. For instance, Dr. Master's report was in the hands of the command before Colonel Jones had made his final decision regarding the promise and that report fully set out in black and white the extended nature of that misconduct. Moreover, the command and the OSI were in touch with the progress on the case made by the civilian authorities—and that progress included extended interviews with appellant's wife and his abused daughter.

Third, again regarding this mistaken belief, the Court of Military Review puts the blame for this mistake at appellant's doorstep by finding that he had "not deal[t] forthrightly with the Government." 30 MJ at 895. It may be reasonable to infer from a promise like the one we have here or from a pretrial agreement an obligation to proceed in "good faith" in some respect, *see United States v. Koopman, supra* at 110. That is far different, however, from inferring from this promise a proviso that it was valid only if appellant *already* had been "forthright" as to his misconduct. If the Government relied solely on *appellant's* version of events in making its decision and its subsequent promise—without any expression of a caveat that that version must have been accurate and complete—the Government proceeded at its own risk.

All this assumes, of course, that appellant was *not* forthright—a conclusion that, frankly, we find suspect from the evidence of record and a so-called "fact" that was *not* found by the military judge, even impliedly. Appellant's friend-to-friend conversation with Wilson necessarily focused primarily on the trauma of the night before; he never was asked by Wilson to divulge more, and in context the conversation does not reflect an attempt by appellant to be clever or an affirmative representation by him that there was no more. Indeed, there is no hint in the record that, at that juncture, either Wilson or appellant considered that this conversation between buddies was official in nature or part of a basis for later disposition of the matter.

Furthermore, the record does not factually support any inference that appellant was deceitful with anyone at any other, more formal, stage. The fact is, each time he was required to be complete and "forthright"—with Dr. Master, with Mr. Bixler, with civilian authorities, and with the OSI—he candidly addressed himself to his misconduct. Appellant had no reason at all to suspect that the promise was the prod-

---

3. Even if appellant's motivation had been limited to avoiding civilian prosecution and, thus, even if he had been otherwise obligated to participate in the program apart from his command's promise, "in the present context this does not preclude ... [this participation in the program] from creating a binding obligation on the part of the command." *United States v. Koopman*, 20 MJ 106, 110 (CMA 1985) (footnote omitted).

uct of incomplete information. As we just observed, the failure of Air Force officials to be *"knowledgeable"* in making their promise was due to their own inattention and lack of even rudimentary investigation, not to appellant's deception.

Finally, the mention "of some significance" by the Court of Military Review of the fact "that the United States was not a party to any agreement between the appellant and Nevada authorities," 30 MJ at 895, is a red herring. Appellant does not now avail himself of any agreement he had with the State of Nevada; instead, he seeks to hold the United States to its promise that, if he fully complied with his arrangement with Nevada authorities, the United States would not court-martial him. We will enforce that promise.

### B

■ We also note that, to a significant degree, the prosecution of Kimble resulted from his damaging admissions to the OSI during his interview on August 11. It seems apparent that these admissions were, in turn, a direct result of assurances given appellant by Chief Master Sergeant Wilson, who was not only his friend but also his reporting official.

In substance, this assurance amounted to a representation that any statement made to the OSI would not be used in a court-martial; indeed, the assurance actually seems to be that the *only* purpose of the OSI interview was to get information for the command so that it could administratively review Kimble's security clearance. In view of Wilson's position, that representation is binding on the Government.

Even if the statement made to the OSI was not used at trial, we should not allow a prosecution which arose because of a confession given to investigators pursuant to a *de facto* promise of use immunity. As we

said as *United States v. Boyd,* 27 MJ 82, 84 (1988):

The objective of use immunity is to leave "the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Kastigar v. United States,* 406 U.S. [441] at 462, 92 S.Ct. 1653 at 1666, 32 L.Ed.2d 212 [(1972)].... To ensure this, the Government is "prohibited from making any ... use of·compelled testimony and its fruits." *Murphy v. Waterfront Commission of New York Harbor,* 378 U.S. 52, 79, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 ... (1964) (footnote omitted).

Given the state of the evidence and the development of the case as of August 11, the Government has not shouldered its burden of demonstrating that appellant's admissions to the OSI on that date were not used, both to make the decision to prosecute and to build the prosecution's case.

### C

There is one final issue that is appropriate for us to address at this point. The military judge "noted that Colonel Jones was not the general court-martial convening authority, nor is there any evidence that he was acting with any knowledge or authority of the general court-martial convening authority." In context, it is apparent that the military judge—after ruling that there was no "immunity, defacto or otherwise,"—was expressing his conclusion that, in any event, the source of the claimed immunity (Colonel Jones) lacked authority to give it.[4]

■ RCM 704(c), Manual for Courts–Martial, United States, 1984, prescribes, "Only a general court-martial convening authority may grant immunity, and may do so only in accordance with this rule." Additionally, to remove any doubt that this power is to remain closely held, subsection (3) of this provision states, "The authority

---

4. Unfortunately, we do not have the benefit of the views of the Court of Military Review on this question because it failed to address it—probably because, like the military judge, the court found there was no immunity. Curiously,

neither has the Government commented on the issue, although one would expect an advocate seeking to sustain the ruling below to urge any rationale reasonably available upon which the appellate court might choose to hang its hat.

to grant immunity under this rule may not be delegated." Accordingly, a promise of immunity from a subordinate officer does not bind a general court-martial convening authority who neither knows of it nor authorizes it. *See United States v. Thompson,* 11 USCMA 252, 29 CMR 68 (1960).

On the other hand, the Discussion of RCM 704(c) in the Manual explains:

> Only general court-martial convening authorities are authorized to grant immunity. However, in some circumstances, when a person testifies or makes statements pursuant to a promise of immunity, or a similar promise, *by a person with apparent authority to make it,* such testimony or statements and evidence derived from them may be inadmissible at a later trial. *Under some circumstances a promise of immunity by someone other than a general court-martial convening authority may bar prosecution altogether.*

(Emphasis added.) The Drafters' Analysis indicates that these observations come from *Cooke v. Orser, supra,* and *United States v. Caliendo,* 13 USCMA 405, 32 CMR 405 (1962). Manual, *supra* at A 21–34. Indeed, in a variety of factual circumstances, this Court has made clear that—to paraphrase the quotation by the court below from its opinion in *United States v. Spence,* 29 MJ 630, 637 (1989)—the United States cannot break its word. *See, e.g., United States v. Brown,* 13 MJ 253 (CMA 1982); *Cooke v. Orser* and *United States v. Caliendo,* both *supra.*

One particularly interesting situation, in terms of some parallels with the instant case—was offered in *United States v. Churnovic,* 22 MJ 401 (CMA 1986). There, a person who later became identified as the accused left an anonymous note with the leading chief petty officer aboard the ship, asking " 'if a person, ... giving information about drugs or whereabouts about drugs, something like that, or hashish will the person get in trouble.' " After discussing the matter with the ship's executive officer, the chief assured the accused that he would not get into any disciplinary trou-

ble at all if he turned in or had any information about hashish. Interesting for the coincidence with the case at bar, when the chief went to the executive officer and when the latter informed the chief that no trouble would flow, both assumed—incorrectly, it turned out—that the hashish that the accused would turn in would be someone else's, not his own.

We cited *Cooke v. Orser* and *United States v. Brown,* both *supra,* for the proposition that, where an official who has either expressed or implied authorization of the general court-martial convening authority promises immunity, "the Government must abide by an agreement on which an accused has reasonably relied to his detriment." *United States v. Churnovic, supra* at 405 (footnote omitted). Tracing the "authorization" in that case, we began with the leading chief (who was the senior enlisted person on board); moved to the executive officer with whom the chief had conferred; and then drew the "logical inference," in the absence of any government evidence to the contrary, that the two of them "were acting with the full knowledge and authorization of the ... [ship's] captain...."

Of course, even this "logical inference" got only as far as the ship's captain, who was a *special* court-martial convening authority. We observed, however, that the offense involved in that case was one that typically would be tried by a special court-martial, not a general court-martial. "Also," we noted, "various types of immunity for those who come forward, confess drug activity, and seek rehabilitation are quite common in the Armed Services and elsewhere. Therefore, no reason exists why a promise of immunity cannot be enforced if it was made with express or tacit authorization from the ship's captain, who would convene special courts-martial to try members of his crew." 22 MJ at 405.

As an aside, that case also involved some allegation that Churnovic might have had some ulterior motive for his actions. We responded—again with some interesting parallels with Kimble's situation:

Regardless of Churnovic's motivation, if he was promised immunity from prosecution for possessing hashish in return for revealing its location and if he provided the requested information, he is entitled to the benefit of that promise. There is no evidence that appellant extracted the promise of immunity by fraud. Furthermore, contrary to the view of the Court of Military Review, there is no showing that his hands were "unclean." Indeed, his cooperation with Special Agent Waddell—who knew nothing of the previous promise made by Eusebio [the leading chief]—was of such a nature that the investigator independently recommended that appellant receive no more than nonjudicial punishment.

As we admonished in *Churnovic:*

Care should be taken in making promises of immunity; ... However, once made, the promise should be complied with by the Government, rather than evaded on technical grounds.

*Id.* at 407.

 In the case now before us, Colonel Jones was, indeed, just a special court-martial convening authority. We are uninformed whether offenses such as the ones involved here would typically be tried by a special court-martial in that command. *See id.* Though we have some doubt in that regard, it is at least interesting that the inclination of the special court-martial convening authority did appear to control the disposition of this case: When Colonel Jones was willing to proceed on a path that did not involve a court-martial, that is what happened; when his successor thought otherwise, however, court-martial charges ensued.

Additionally, we are aware that in many communities, instances of child abuse that are no more aggravated than those involved here often are resolved in a social-services atmosphere, rather than a judicial one. Thus, as in *Churnovic*, it is not entirely clear that, when the special court-martial convening authority made his

promise of immunity, he did so without at least the tacit authorization of the general court-martial convening authority.

Fundamentally, however, what military officials at all levels must keep in mind is this: Regardless whether the promise be one formally of immunity pursuant to RCM 704, or whether it be one that induces the accused into making incriminating admissions as in *Churnovic*, or whether it is one that in some other way is relied upon by an accused to his detriment, due process requires that the accused get the benefit of his bargain. *See Cooke v. Orser, supra.*

V

The decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The Charge and its specifications are dismissed.

Chief Judge SULLIVAN concurs.

COX, Judge (dissenting):

There is an old legal cliche, Bad facts make for bad law. The majority opinion affirms that cliche.

Judge Cook stated it better than I can, when he said:

[T]he power to grant immunity [is] derived from the power of a convening authority to discontinue investigations of crimes, dismiss formal charges, direct that a charge be withdrawn, and set aside findings of guilty, which are plenary in nature. Clearly, such powers can only be exercised specifically: no one could assert that someone had *apparent* authority to convene a court-martial, or dismiss charges. Only actual authority can be exercised in those related circumstances. From this, I conclude that the power to grant immunity from prosecution can only be exercised by a person authorized to convene general courts-martial and he must knowingly so act. It is not enough that an accused may have reasonably believed that he had been granted immunity; there must be actual immunity granted, or there is no

immunity. *See United States v. D'Apice*, 664 F.2d 75 (5th Cir.1981).

*Cooke v. Orser*, 12 MJ 335, 364–65 (CMA 1982) (Cook, J., dissenting) (footnote omitted).

Senior Judge Everett, joined by Chief Judge Sullivan, are obviously concerned about servicemembers being treated unfairly by their superiors. So am I. In my judgment, the remedy for unfair treatment lies in suppressing the "fruits of the poisonous tree," not in creating a legal fiction of "de facto" immunity. "[T]he decision to grant ... immunity should be left in the hands of the Executive Branch." *United States v. Zayas*, 24 MJ 132, 137 (CMA 1987) (Cox, J., dissenting). Additionally, there may be cases so outrageous on their facts that concepts of denial of due process cause judges to dismiss the charges. *See, e.g., Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). This case does not rise to such an offensive level.

I would remand the case to the Court of Military Review and order it to strike all evidence from the record which was or could have been derived from June 15, 1988, when the decision was communicated to appellant that the case would be handled by civilian agencies. Every statement that was given by appellant from that point forward, and evidence derived therefrom, should be stricken from the record. Art. 31(d), Uniform Code of Military Justice, 10 USC § 831(d). Then the case could be remanded to the convening authority for a new investigation under Article 32, UCMJ, 10 USC § 832, or other appropriate disposition, depending on the state of the evidence. There is no question in my mind that appellant had a right to rely upon his commanding officer's representations that the matter would not result in a court-martial if he cooperated with the civil authorities. I would not elevate this promise to a grant of immunity, but I would find that it constituted a form of legal coercion under Article 31.

Accordingly, I dissent from the majority opinion, but I do so recognizing that the end result might well be the same.