UNITED STATES, Appellee

v.

Sergeant Michael D. CONKLAN, 417–19–1360, United States Army, Appellant.

ARMY 9301884.

U.S. Army Court of Criminal Appeals.

21 Feb. 1995.

---

For Appellant: Captain Blair Jacobs, JAGC (argued); Major Roy H. Hewitt, JAGC (on brief).

For Appellee: Captain John W. O'Brien, JAGC (argued); Colonel John M. Smith, JAGC, Major Lyle D. Jentzer, JAGC (on brief).

Before CAIRNS, GONZALES, and RUSSELL, Appellate Military Judges.

## OPINION OF THE COURT

RUSSELL, Judge:

A military judge sitting as a general court-martial found the appellant guilty, pursuant to his pleas, of three specifications of unlawful sexual contact with a trainee and carnal knowledge in violation of Articles 92 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 920 (1988) [hereinafter UCMJ]. A panel of officers sentenced the appellant to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances and reduction to Private E1. The convening authority, pursuant to a pretrial agreement, reduced the confinement to five years, but otherwise approved the sentence as adjudged.

This case is before the court for automatic review pursuant to Article 66, UCMJ, 10 U.S.C.A. § 866. We have examined the record of trial, the two assignments of error,[1] the errors personally asserted by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and the government's reply thereto. We have also considered matters raised in oral argument. Only the assigned errors have sufficient merit to warrant discussion.

### I. De facto Immunity

#### A. Facts

In August of 1989, while on leave in the civilian community, the appellant engaged in unlawful carnal copulation with a twelve-year-old girl. He was soon charged by local civilian authorities with statutory rape and briefly confined prior to making bail. In September 1989, after his release from civilian confinement, the appellant discussed his situation with his battalion commander, Lieutenant Colonel (LTC) Lawson. Lieutenant Colonel Lawson told the appellant that both the Army and the civilian authorities could prosecute the carnal knowledge offense, but if the civilian authorities dropped their charges, the Army would not prosecute. Pending the outcome of the civilian charges, the appellant's military records were "flagged" and all favorable personnel actions were suspended.

On 20 April 1990, the civilian grand jury returned a "no bill," which resulted in no prosecution by civilian authorities. In a letter dated 24 April 1990, the appellant's civilian lawyer notified LTC Lawson of the "no bill" and informed him that the "no bill" would bring the civilian prosecution to a close. Finally, the staff judge advocate sent a letter to the family of the victim asking them if they wanted to make a statement; the family did not respond.

On 8 May 1990, First Lieutenant (1LT) Teufert, LTC Lawson's adjutant, executed a Department of the Army Form 268 (Report to Suspend Favorable Personnel Actions)

---

1. I. THE MILITARY JUDGE ERRED BY DENYING SGT CONKLAN'S MOTION TO DISMISS ADDITIONAL CHARGE I BECAUSE SGT CONKLAN HAD THE FUNCTIONAL EQUIVALENT OF A GRANT OF IMMUNITY REGARDING THIS OFFENSE.

II. THE CONDITIONAL PORTION OF SGT CONKLAN'S PRETRIAL AGREEMENT WHICH ALLOWED APPELLANT TO RAISE MOTIONS CHALLENGING THE CONSTITUTIONALITY OF THE MILITARY JUDGE AND REQUESTING A FINDING OF DE FACTO IMMUNITY WAS VOID AS A MATTER OF PUBLIC POLICY AND LAW.

that removed the flag from the appellant's records because the civilian charges had been "dropped" and the case closed "favorably" to the appellant. When 1LT Teufert informed him that the flag had been lifted, the appellant asked if that meant LTC Lawson was not going to prosecute him. First Lieutenant Teufert's reply indicated that LTC Lawson did not intend to take any further adverse action on the offense of carnal knowledge.

Based on the information provided through his conversations with LTC Lawson and 1LT Teufert, the appellant concluded that the Army would not prosecute him for the carnal knowledge offense that had been disposed of by the civilian authorities. On 1 August 1990, he reenlisted in the Army. Thereafter, he was promoted to sergeant, received schooling and awards, and otherwise apparently served honorably without incident until the events in 1993 that became the subject matter for the most recent charges. At that time a different convening authority considered the 1989 carnal knowledge offense and referred a charge under Article 120(b), UCMJ, to a general court-martial.

We are left to decide whether the military judge abused his discretion when he ruled that LTC Lawson's representation that the appellant would not be prosecuted did not amount to a de facto grant of transactional immunity.

### B. Law

▆▆▆ Only a general court-martial convening authority (GCMCA) may grant immunity and that power may not be delegated. Rule for Courts–Martial 704(c) [hereinafter R.C.M.]. However, another official may make the functional equivalent of an offer of immunity when he (1) manifests apparent authority to grant immunity; (2) makes a representation that causes the accused to honestly and reasonably believe that he will not be hailed into court *if he fulfills a certain condition;* and (3) has at least the tacit approval of the GCMCA. An accused may complete the creation of a de facto grant of immunity when he relies on the representation to his detriment by actually fulfilling the condition suggested by the government. *See Samples v. Vest,* 38 M.J. 482 (C.M.A.1994); *United States v. Kimble,* 33 M.J. 284 (C.M.A. 1991) (completed sex offenders course); *Cooke v. Orser,* 12 M.J. 335 (C.M.A.1982) (made incriminating statements). Where an accused consummates such a de facto offer, due process requires that the government ungrudgingly provide the accused the benefit of his "bargain." *Cooke,* 12 M.J. at 343.

### C. Discussion

We are satisfied on the facts of this case that LTC Lawson manifested apparent authority to grant immunity;[2] made statements that the accused honestly and reasonably construed as an official representation that the Army would not prosecute him;[3] and that LTC Lawson had at least the tacit approval of the GCMCA to make such a statement.[4]

---

**2.** Lieutenant Colonel Lawson was the appellant's battalion commander, and the appellant was a young junior enlisted soldier with no special expertise in military justice matters. Though LTC Lawson no doubt understood that he did not have the personal authority to bar prosecution, he certainly did not convey that limitation to the appellant. Rather, he conveyed the impression that he could dispose of the appellant's case within his sole discretion.

**3.** In his stipulated testimony, LTC Lawson stated, "[B]ased on his conversations and subsequent Army actions, the accused could have reasonably assumed no prosecution would take place."

**4.** This finding of ultimate fact respectfully departs from the special finding of the military judge that there was *no* evidence that LTC Lawson had discussed the "no prosecution" plan with any judge advocate, superior officer, higher commander or convening authority. In the absence of any government evidence to the contrary, we are satisfied that the record supports the logical inference that the GCMCA at least was putatively aware of and tacitly approved the initial decision not to prosecute the appellant for carnal knowledge. The staff judge advocate was personally involved in sending a letter to ascertain whether the victim's family desired to make a statement. Given the staff judge advocate's personal involvement and the strong potential for negative publicity when a child from the civilian community is victimized by a soldier, we are satisfied that the prosecutorial strategy in this sensitive case was coordinated up and down the military justice chain of command. *Cf. United States v. Churnovic,* 22 M.J. 401, 405 (C.M.A. 1986). (Logical inference that executive officer and senior enlisted acted with full knowledge and authorization of the convening authority.)

■ However, LTC Lawson's representation did not call upon the accused to fulfill any condition in exchange for whatever benefit was conferred. It was no more than an unconditional and gratuitous statement of a present intent not to charge the appellant with the carnal knowledge offense. *See* R.C.M. 306(a), (b) and (c). This representation was subject to change in the sole discretion of the same or a different convening authority at any time prior to the expiration of the statute of limitations (five years). *See* R.C.M. 307 discussion and R.C.M. 403 discussion.

■ We reject the appellant's invitation to characterize his reenlistment as the sort of "detrimental reliance" that gives rise to a governmental duty to refrain from prosecution in this case. While we are satisfied that the appellant would not have reenlisted if he thought that the Army was going to prosecute him, his reenlistment was not bargained for or otherwise contemplated by the parties as a condition of the Government's unilateral decision not to prosecute. The mere fact that his reenlistment ultimately worked to his disadvantage because he thereby remained subject to military jurisdiction is too attenuated a consequence to constitute "detrimental" reliance. Moreover, we are loath to ever characterize active duty military service as "detrimental," especially when a soldier has received all of the pay and benefits he deserved.

## II. The Plea Bargain

### A. Facts

The trial defense counsel entered negotiations with the Government for a pretrial agreement, seeking to limit confinement in exchange for guilty pleas. During the course of the bargaining negotiations, the parties reached an understanding that, if the appellant were to plead guilty unconditionally, the convening authority would limit confinement to four years. However, the appellant wished to challenge the legality of the process by which the military judge was appoint-

ed, and to claim that the prosecution was barred by a de facto grant of transactional immunity. After further bargaining, the parties agreed in writing that the appellant could raise the two claims as part of a conditional plea of guilty, but that the quantum limit on confinement would be increased to five years.

### B. Law

■ A term or condition in a pretrial agreement shall not be enforced if it deprives the accused of the right to due process or the right to challenge the jurisdiction of the court-martial. R.C.M. 705(c)(1)(B). Bringing a prosecution barred by a grant of transactional immunity is a violation of Constitutional due process; thus, a claim based on a grant of transactional immunity survives. a guilty plea, and may be heard for the first time on appeal. *United States v. Corcoran*, 40 M.J. 478, 482 (1994) (citing *Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975), and distinguishing R.C.M. 907(b)(2)(D)(ii)).

### C. Discussion

■■ An accused has the right to a fair trial, but not a right to a pretrial agreement. *United States v. Helweg*, 32 M.J. 129, 134 (C.M.A.1991). However, while both the government and an accused are legally free to forego a pretrial agreement altogether, it does not follow that the parties are legally unfettered once they elect to enter the realm of pretrial negotiations. At that juncture, they must take care to ensure that nonfrivolous due process or jurisdictional claims are not bargained away in reaching a pretrial agreement. *See* R.C.M. 705(c)(1)(B).

The pretrial agreement here did not deprive the accused of his right to assert his due process and jurisdictional claims; it merely required the appellant to accept another year in prison as the price for litigating those rights. While the appellant's bargain did not ultimately deprive him of the absolute right to raise those motions prior to pleas,

---

We are also aware that in many general court-martial jurisdictions, convening authorities often defer to civilian authorities so that child welfare cases may be resolved in a social services atmo-sphere, especially where the child's family wishes to avoid the ordeal of a judicial proceeding. *See United States v. Kimble*, 33 M.J. 284, 293 (C.M.A. 1991).

the parties' willingness to encumber those rights in the bargaining process substantially endangered them. It is, therefore, the inclusion of such matters in the bargaining process that we condemn here. Such inclusion contemplated the possibility of taking from the military judge the resolution of fundamental pretrial rights, and leaving their outcome to the vagaries of the plea bargaining process. Such practice is too prone to result in meritorious claims going unremedied at trial and undetected on appeal. *See United States v. Jones,* 20 M.J. 853 (A.C.M.R.1985). Appropriate plea bargaining practice in cases such as this case would call for the parties to resist the temptation to encumber the litigation of fundamental pretrial rights, and to ungrudgingly cooperate to ensure that such claims are clearly resolved by the military judge outside of the pretrial agreement process.

Thus we hold, as a matter of law and public policy, that the rights to litigate non-frivolous, good faith claims of lack of jurisdiction and transactional immunity are not proper subjects for plea bargaining. Accordingly, any portion of a pretrial agreement that results directly from such bargaining is unenforceable. We are able in this case to ascertain with mathematical certainty that the objectionable portion of the quid pro quo was an additional year of confinement. Thus, we can leave the remainder of the agreement in full force and effect.

### III.  Discussion

The findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted and the entire record, the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for four years, forfeiture of all pay and allowances and reduction to Private E1.

Senior Judge CAIRNS and Judge GONZALES concur.