Scott D. CUNNINGHAM Captain, U.S. Marine Corps,

and

Jeff A. Gehlke, Captain, U.S. Marine Corps, Petitioners,

v.

Commander T.L. GILEVICH, United States Navy Military Judge, Navy–Marine Trial Judiciary, WESTPAC, North Judicial Circuit,

and

Brigadier General R.L. Smith Commanding General, MCB Camp Smedley D. Butler

and

the United States, Respondents.

Misc. No. 92–38.

U.S. Court of Military Appeals.

Argued Sept. 11, 1992.

Decided Sept. 30, 1992.

For Petitioners: *Lieutenant David P. Sheldon*, JAGC, USNR (argued); *Lieutenant Franklin J. Foil*, JAGC, USNR.

For Respondents: *Lieutenant Commander Lawrence W. Muschamp*, JAGC, USN (argued); *Colonel T.G. Hess*, USMC (on brief); *Commander W.F. Shields*, JAGC, USN.

*Opinion of the Court*

GIERKE, Judge:

Petitioners have asked this Court for extraordinary relief in the nature of Writs of Prohibition and Mandamus to prohibit their prosecution and order Marine Corps authorities to dismiss the charges against them, on the ground that their prosecution is barred by *de facto* grants of transactional immunity. As a result of the death of one Air Force participant and minor injuries to a second participant in a joint training exercise, caused by an MK3A2 concussion grenade, both Captain Cunningham and Captain Gehlke were charged with dereliction of duty, manslaughter by culpable negligence, and aggravated assault by culpable negligence, in violation of Articles 92, 119, and 128, Uniform Code of Military Justice, 10 USC §§ 892, 919, and 928, respectively. In addition, Captain Cunningham was charged with falsely accounting for 25 MK3A2 grenades, in violation of Article 107, UCMJ, 10 USC § 907. These charges were referred to a general court-martial. A hearing on petitioners' motion to dismiss the charges was held on July 28–29, 1992. After the military judge denied the motion to dismiss, petitioners asked this Court for extraordinary relief. In an order dated August 19, 1992, we stayed the court-martial proceedings * pending our decision on the petition for extraordinary relief.

## I. Factual Background

The joint training exercise, named "Midnight Trail," was conducted at Andersen Air Force Base, Guam, on August 16, 1991. Captain Cunningham was the commander of the Marines designated as the attacking force during the exercise, and Capt. Gehlke was the Marine exercise controller. On the night of the incident, Capt. Gehlke provided a statement to the Wing Safety Officer at Andersen Air Force Base. He was not treated as a suspect or advised of his rights at that time.

Colonel Naylor, the Commanding Officer, Marine Barracks, Guam, questioned both Capt. Cunningham and Capt. Gehlke on the day after the incident. He admonished Capt. Cunningham for improperly storing ammunition in the operations office, but he did not suspect either Capt. Cunningham or Capt. Gehlke of any culpable negligence related to the death and injuries during the training exercise. After the training incident, there were several investigations, including an Air Force Accident/Safety Investigation Board; a board appointed by the Commander-in-Chief, United States Pacific Command (PACOM); and a board appointed by the Commander–in–Chief, Pacific Air Forces (PACAF). The PACOM board was headed by Rear Admiral (RADM) Perkins, Commander, Naval Forces, Marianas (COMNAVMAR); and the PACAF board was headed by Col. Moomaw, who was not in the chain of command or supervision for any of the Marines involved. RADM Perkins was Col. Naylor's immediate superior and the general court-martial convening authority for Marine Barracks, Guam. Both Capt. Cunningham and Capt. Gehlke knew that RADM Perkins was Col. Naylor's superior. Capt. Cunningham, in his capacity as legal officer, knew that RADM Perkins was the general court-martial convening authority for Marine Barracks, Guam.

Col. Naylor, Lt.Col. Lee (his Executive Officer), Capt. Gehlke, and Capt. Cunningham all were questioned by the PACOM board. Prior to testifying, they had discussed the investigation among themselves, concluded that they "had nothing to worry about," and decided to cooperate fully. When Capt. Gehlke appeared before the PACOM board on August 28, he found the atmosphere "very tense ..., cold and im-

---

* This Court has taken affirmative action in the past to prevent the exercise of court-martial jurisdiction, when "the action was considered necessary to prevent a waste of the time and energy of the military tribunals involved throughout the trial and appellate stages when it was abundantly clear that any verdict of guilty returned by the court-martial would be overturned." *Chenoweth v. Van Arsdall,* 22 USCMA 183, 188, 46 CMR 183, 188 (1973) (citation omitted). *See Cooke v. Orser,* 12 MJ 335 (CMA 1982); *Zamora v. Woodson,* 19 USCMA 403, 42 CMR 5 (1970); *Fleiner v. Koch,* 19 USCMA 630 (1969)(order).

personal." He was informed by Commander Blackwood, the board's legal advisor, that he was suspected of dereliction of duty, murder, and manslaughter. At the hearing on the motion to dismiss, Commander Blackwood explained the board's decision to treat Capt. Gehlke as a suspect as follows:

> [R]ather early on in our interviewing process while we were still basically figuring out what was going on, we interviewed a Lieutenant Colonel McCallum who was an Army Reservist brought on active duty for the exercise .... Colonel McCallum spoke to us in great detail and during the course of his statement as I recall I began to be concerned that Captain Gehlke whose name came up repeatedly in Lieutenant Colonel McCallum's statement might have committed an offense or offenses under the Code.
>
> Subsequently, when we began to interview the Marine Barracks personnel and we became aware that Captain Gehlke would be coming to see us, the five specialist [sic] consulted together and consulted with the investigating officer in determining that it would be necessary to warn Captain Gehlke before we talked to him.

Commander Blackwood later elaborated further as follows:

> Lieutenant Colonel McCallum in his statement raised Captain Gehlke's name numerous times and I had the impression, as did others in the group, that if something had gone wrong here and it was very early on it was hard to say whether anyone had, in fact, committed an offense of the Code or not at that point. But that if someone had done something that was a violation of the Code, it might have been Captain Gehlke.

Capt. Gehlke was visibly upset upon being advised of his rights. He refused to sign the certificate acknowledging that he had been advised of his rights, refused to testify, and requested counsel. At that point, Commander Blackwood terminated the interview.

When Capt. Cunningham appeared before the board, after Capt. Gehlke's initial appearance, he was not advised of his rights, because his name "had come up but only very peripherally and nothing that would have caused us to focus any suspicions that he had committed any offenses under the Code."

After consulting with counsel (Lt. Bunch, USNR), Capt. Gehlke visited Col. Naylor and Lt.Col. Lee, and explained what had happened at the PACOM board. Col. Naylor told Capt. Gehlke that he "should stand on [his] integrity and honesty, that [he had] nothing to hide and nothing to fear." Lt. Col. Lee also said that he "had nothing to fear." When asked at petitioners' subsequent court-martial about any grants of immunity, Col. Naylor testified, "I didn't feel that we had any reason to be concerned about immunity." Asked if immunity was "in [his] mind at that time," Col. Naylor testified that it was not.

Capt. Gehlke returned to Lt. Bunch's office and reported his conversation with Col. Naylor and Lt.Col. Lee. Lt. Bunch advised him not to testify. On the following day, Col. Naylor asked Capt. Gehlke to come to his office. According to Capt. Gehlke:

> Colonel Naylor asked me to have a seat, and we spoke in private, sir. He specifically said, "Jeff, you have to talk to the board. You must provide testimony. What you have is very important, and we need to get it out." And then he reemphasized, sir, "You have nothing to hide and nothing to fear."

Capt. Cunningham testified that Col. Naylor and Lt.Col. Lee told him, "Don't worry about anything. Just tell them the truth. They'll understand it was an unfortunate training accident, and this is all going to go away."

At some time after his initial meeting with Capt. Gehlke, Lt. Bunch called Lt.Col. Lee to discuss the case. Lt.Col. Lee told him, "Dan, there's the bottom line here .... [Lieutenant] Colonel Bowser with the Air Force [and USCINCPAC Senior Controller for the exercise] told these investigators that he specifically looked at Jeff

[Gehlke] and Captain Cunningham and said, 'I do not want that hand grenade in this exercise.'" When Lt. Bunch asked Lt.Col. Lee if there was a problem with the ammunition, Lt.Col. Lee replied, "Dan, if you're talking about this grenade, we've already heard that .... The Air Force is screaming and yelling that this is an offensive hand grenade or a fragmentation grenade or something like that .... All of this is ridiculous. It's a training grenade." Lt. Bunch then understood why Capt. Gehlke had been treated as a suspect: the board had evidence that the MK3A2 grenade should not have been used. Lt.Col. Lee continued, "The bottom line is, Dan, if Jeff is telling the truth that Colonel Bowser approved this grenade, Jeff's got nothing to worry about. This thing is going to go away." Then Lt.Col. Lee cautioned Lt. Bunch, "If Jeff is lying to us, the old man will screw him." Lt. Bunch asked Lt.Col. Lee about Capt. Gehlke's duties as a controller and received the following response: "We have no problem with how Jeff performs his duties as a controller. It's not a problem."

Lt. Bunch contacted Capt. Cunningham, who had not yet requested counsel, and Capt. Cunningham supported Capt. Gehlke's assertion that Lt.Col. Bowser had approved use of the MK3A2. Both Capt. Cunningham and Capt. Gehlke told Lt. Bunch that Lt.Col. Bowser had approved use of the MK3A2 grenade and they were willing to take a polygraph on that issue if necessary. In Lt. Bunch's judgment, he "had one issue and one issue only and that was whether or not Colonel Bowser approved this order [permitting use of the MK3A2 grenade during the exercise]." Lt. Bunch then advised Capt. Gehlke to "tell his story to the board."

Capt. Gehlke returned to the PACOM board on August 30, accompanied by counsel, and he testified fully about his participation in the training exercise. Prior to his substantive testimony, Capt. Gehlke and the board's legal advisor had the following discourse:

[Cdr. Blackwood] [And you have not checked the block that you do not desire to have a lawyer present, obviously, since you have your lawyer present. And you have initialed the block that says, "This acknowledgement and waiver of rights is made freely and voluntarily by me and *without any promises or threats having been made to me, or pressure of coercion of any kind having been used against me.*" Is that correct?]
[Capt. Gehlke] [That's correct, ma'am.]
[Cdr. Blackwood] [You've discussed that with your counsel, and you're comfortable that that's a correct representation?]
[Capt. Gehlke] [Yes, I am, ma'am.]
(Emphasis added.)

Lt. Bunch talked to Col. Naylor after Capt. Gehlke testified and opined that "this Air Force Colonel's a liar." Col. Naylor replied, "I'm glad to hear that .... Dan, you and Jeff need to go up to that board and tell them that."

Capt. Cunningham appeared before the board and testified fully. Capt. Cunningham was not advised of his rights as a suspect, but he knew that Capt. Gehlke had been. Capt. Cunningham debriefed Col. Naylor and Lt.Col. Lee about his testimony. He described their response as follows:

They were happy that I got everything—that I told the entire Marine side as I knew it, and they kept reiterating over that it was an unfortunate training accident, that COMNAVMAR should see that now, and they can get on with their investigation and wrap it up.

When asked how he interpreted the "nothing to hide, nothing to fear" attitude of Col. Naylor and Lt.Col. Lee, Lt. Bunch responded:

Well, to me, it didn't require a whole lot of analysis. I thought it was extremely obvious that they were not going to be pursuing Jeff at a court-martial unless they were convinced in their minds that Colonel Bowser had looked at Captains Gehlke and Cunningham and said, "Do

not use the Mark–3 Alpha hand grenade." *I explained to Captain Gehlke that if Colonel Lee wanted to—or rather Colonel Naylor wanted to pursue that issue, I guess he could but that the indications I was given is that they believed him and that they thought he had nothing to hide and should go up and tell that story to the board because if he didn't tell the board, that it was going to look very bad for Jeff and for the Marine Barracks.*

(Emphasis added.)

After Capt. Gehlke testified before the PACOM board, Lt. Bunch was concerned that some board members had formed an opinion that Capt. Gehlke was "responsible" for the training accident. He again called Lt.Col. Lee and asked about the grenade, saying "they sure did make it sound dangerous. Are you sure Colonel Naylor's not upset about this?" Lt.Col. Lee responded, "Dan, it's a training device. We've used it in the past." Lt.Col. Lee asked, "Did it make it on the record about Bowser and all that?" and Lt. Bunch responded that it had. Lt.Col. Lee said, "Good. I wanted to straighten that up because I don't think he's being honest."

Capt. Gehlke and Capt. Cunningham, along with their counsel, met with Col. Naylor after appearing before the PACOM board. Lt. Bunch described the theme of this meeting as follows: "The Marine Barracks had nothing to hide, were not after these guys. This is not a problem. These people are spun up. We've had a death. Things tend to get exaggerated like this. Our stance is that we cooperate."

After both Capt. Gehlke and Capt. Cunningham had testified before the PACOM board, they were summoned to testify before the PACAF board. They asked Col. Naylor why the Air Force could not use their statements from the PACOM board. Capt. Cunningham testified that Col. Naylor told them, "Just go ahead and tell the truth, and they'll see it was an unfortunate training accident, and it will all work out." Capt. Cunningham "was very shocked" when, for the first time, the PACAF board

treated him as a suspect. He requested counsel and was excused. (The record does not reflect what offenses Capt. Cunningham was suspected by the PACAF board of committing.) He called Lt.Col. Lee and was told, "There's nothing to worry about. We'll get you a lawyer appointed, and we'll continue on." Col. Naylor called a meeting with Capt. Gehlke and Capt. Cunningham and their counsel and repeated his previous advice: "Tell the truth. Tell them everything you know, and you all have nothing to worry about." Capt. Cunningham returned to the PACAF board and testified.

Lt. Bunch was concerned about Capt. Gehlke's appearance before the PACAF board because he perceived them as very adversarial. Nevertheless, after receiving assurances from Lt.Col. Lee, he advised Capt. Gehlke to cooperate. Lt. Bunch described his "perception" of the situation as follows:

> Sir, it was, as I explained, first of all there was an implication that this was a Marine Corps versus Air Force thing. And that if any pressure to prefer any kind of charges came, it would come from the Air Force and that the Marine Barracks was simply not inclined to do that to Captain Gehlke.
>
> Secondly, I firmly believe that any formal proceedings would be begun by Colonel Naylor, and I remember being extremely shocked when I found out otherwise . . . .

Charges were preferred against Capt. Cunningham and Capt. Gehlke by a member of the Legal Service Support Section, 3d Service Support Group, located in Okinawa, on January 16, 1992. The statements of Capt. Cunningham and Capt. Gehlke before the PACOM and PACAF boards were incorporated into the Article 32 investigations. On March 18, 1992, the charges against both officers were referred for trial by general court-martial. Lt. Bunch described Capt. Gehlke's response as, "They sold me out. They're the ones that made us talk. They promised nothing would happen and now they are prosecuting me."

As Lt. Bunch explained to Capt. Gehlke, "Apparently it was some 'big-wheel' back in Okinawa or Hawaii who was after him," and that he had "heard the command, including Colonel Naylor," was "in trouble." In fact, the PACOM board recommended "Non-judicial Punishment" for Lt.Col. Lee and Lt.Col. Bowser; an "Administrative Caution" for Col. Naylor; and an "Article 32, UCMJ, Hearing" for Capt. Gehlke and Capt. Cunningham. At petitioners' court-martial, Lt. Bunch concluded his testimony by asserting, "[I]f I had known any of this at the time, no way would Jeff ha[ve] opened his mouth."

The defense motion to dismiss the charges because of *de facto* transactional immunity being granted by Col. Naylor was denied by the military judge, after which Capt. Cunningham and Capt. Gehlke petitioned this Court for extraordinary relief. The military judge made numerous findings of fact, including the following:

11. COL Naylor personally spoke to both CAPT Gehlke and LT Bunch, asserting a need to get the true information out to RADM Perkins' investigation. LCOL Lee told LT Bunch that a witness had told the board the use of MK3A2 grenades had been ruled out prior to the exercise and it was critical for CAPT Gehlke to contradict that statement if, as previously stated, their use had been approved.

12. Based upon the statements made by COL Naylor and LCOL Lee to CAPT Gehlke and to LT Bunch, CAPT Gehlke later made statements to both the Navy and Air Force investigations.

13. Prior to being called before COL Moomaw's investigation, LT Bunch was again told by LCOL Lee that, despite the apparent adversarial stance of the Air Force, CAPT Gehlke needed to cooperate and wrap the entire matter up.

14. Prior to the convening of the investigations by RADM Perkins and COL Moomaw, neither CAPT Gehlke, CAPT Cunningham, COL Naylor nor LCOL Lee had been advised the captains were going to be considered suspects or that they were likely to face disciplinary action.

\* \* \*

16. CAPT Cunningham was ordered to appear before RADM Perkins' board after CAPT Gehlke. He was not advised he was suspected of committing any offenses and provided a statement. A previous co-accused in this case, LCPL Joyner, was read his rights at RADM Perkins' investigation.

17. Before and during the course of the investigations, neither COL Naylor or LCOL Lee anticipated or intended to initiate disciplinary action against either officer under the UCMJ. The representations made by COL Naylor and LCOL Lee were in apparent good faith and not intended to distract investigators from any personal accountability of the Marine Barracks' senior officers.

\* \* \*

19. COL Naylor did not believe either CAPT Gehlke or CAPT Cunningham should be concerned about disciplinary action resulting from the training accident. The desires of the command expressed throughout to both officers were to go in and tell the truth because COL Naylor did not believe there was anything to hide. He believed it was in the best interest of everyone concerned to answer the questions honestly, to get the truth out, to cooperate with the investigators and to protect the integrity of the officers and the Marine Barracks. This was repeatedly expressed to the officers and their counsel.

20. When CAPT Cunningham elected to remain silent before COL Moomaw and before CAPT Gehlke made his statement to RADM Perkins, COL Naylor met with Captains Gehlke and Cunningham and their assigned counsel to provide further reassurances. At this meeting, COL Naylor urged both Marines to speak to the investigators due to the importance of getting the facts out and getting the inquiries over with. Their attorneys were repeatedly informed by COL Naylor and LCOL Lee that Marine Barracks

was not contemplating disciplinary action and neither CAPT Cunningham or CAPT Gehlke should consider their actions before and during Midnight Trail as a problem .... It was the understanding of counsel, CAPT Gehlke and CAPT Cunningham that no court-martial charges would result from the incident.

## II. *De Facto* Immunity

■ The question before this Court is whether petitioners have shown that Col. Naylor promised them transactional immunity. Only a general court-martial convening authority has the authority to grant either transactional or testimonial immunity. RCM 704(c), Manual for Courts–Martial, United States, 1984. "The authority to grant immunity ... may not be delegated." RCM 704(c)(3). A grant of immunity must be in writing. RCM 704(d).

Nevertheless, this Court has found *de facto* immunity in certain situations falling short of a formal *de jure* grant of immunity. In *Cooke v. Orser*, 12 MJ 335 (CMA 1982), we held that representations by the general court-martial convening authority's staff judge advocate to a lieutenant suspected of espionage conferred *de facto* transactional immunity on this lieutenant. In *United States v. Churnovic*, 22 MJ 401 (CMA 1986), we extended the concept of *de facto* immunity to a person acting on behalf of a special court-martial convening authority. We stopped short of holding that transactional immunity was granted by the promises of a chief petty officer on behalf of the ship's captain, but we held that testimonial immunity was granted. We noted that the chief petty officer was "roughly 30% suspicious of Petty Officer Churnovic's personal involvement with the hashish." 22 MJ at 406.

In *Churnovic*, we also noted that the offense, possession of marijuana, was the type of offense commonly disposed of by the ship's captain, a special court-martial convening authority. We observed, "Even if the ship's captain himself had promised immunity with respect to certain crimes, that promise would not have been binding.

For example, a sailor suspected of murder or some other offense of similar gravity could not reasonably rely on a promise by his captain that, in return for information, he would not be prosecuted for the suspected crime." 22 MJ at 405.

In *United States v. Kimble*, 33 MJ 284 (CMA 1991), we again dealt with promises made by a special court-martial convening authority. We held that a promise not to prosecute, made by the special court-martial convening authority, conditioned upon Kimble's participation in a child-sexual-abuse-treatment program, granted Kimble transactional immunity, even though the convening authority was not fully aware of the extent of Kimble's misconduct. We reject the argument, made by government counsel at oral argument, that *Kimble* involved only testimonial immunity. In that case we stated unequivocally that Kimble "seeks to hold the United States to its promise that, if he fully complied with his arrangement with Nevada authorities, the United States would not court-martial him. We will enforce that promise." 33 MJ at 291.

Unlike *Cooke*, *Churnovic*, and *Kimble*, petitioners' case involves a situation in which the superior did not suspect his subordinates of wrongdoing. Those cases involved an offer of immunity which presumed some culpability on the part of the offeree. Even Churnovic was "30%" suspected by his chief petty officer, and the chief petty officer strongly believed that *someone* on the ship had hashish.

■ Petitioners' case involves a commander who believed that no one had committed a crime. Col. Naylor testified that he was not thinking in terms of immunity because he believed that his officers had done no wrong. Col. Naylor and Lt.Col. Lee believed that the case involved an "unfortunate training accident," no more and no less. Col. Naylor repeatedly told Capt. Gehlke and Capt. Cunningham that they were innocent and that the truth would set them free.

Unlike *Churnovic* and *Kimble,* at least one of the petitioners was advised that he was suspected of murder, an offense clearly beyond the jurisdiction of a special court-martial convening authority. In fact, murder is precisely the exception cited in *Churnovic:* a person "suspected of murder ... could not reasonably rely on a promise" of immunity from a special court-martial convening authority. 22 MJ at 405.

Unlike *Cooke, Churnovic,* and *Kimble,* Col. Naylor assured petitioners that they were innocent; but he also made it clear that, if they were lying, they would be "screwed." This warning, conveyed through Lt.Col. Lee, is more consistent with an expression of confidence in their innocence than a promise not to prosecute. Lt.Col. Lee's warning made it clear that petitioners would be prosecuted if the facts were not what they had represented.

Finally, unlike the promisors in *Cooke, Churnovic,* and *Kimble,* Col. Naylor clearly was not acting with the implicit approval of his superior. Col. Naylor was at odds with his superior. RADM Perkins, Col. Naylor's superior and the general court-martial convening authority, was conducting the PACOM board which Col. Naylor believed had blown the training accident out of proportion. Capt. Gehlke had reported the board's hostile attitude to Col. Naylor. Col. Naylor and Lt.Col. Lee were worried that the PACOM and PACAF boards might believe Lt.Col. Bowser's testimony if Captains Gehlke and Cunningham did not contradict it. They saw the reputation of Marine Barracks, Guam, at stake, and they exhorted Captains Gehlke and Cunningham to uphold that reputation by telling the board what they knew. Indeed, Col. Naylor and Lt.Col. Lee perceived an "us versus them" situation, with the Marines (Col. Naylor, Lt.Col. Lee, Capt. Cunningham, and Capt. Gehlke) on one side and the boards chaired by RADM Perkins and Col. Moomaw on the other. Their perceptions were validated when the PACOM board recommended adverse action against all of them.

The legal issue, therefore, is whether petitioners have established that Col. Naylor, who is not a general court-martial convening authority, inadvertently granted them transactional immunity by honestly and in good faith reassuring them that he believed they had done nothing wrong and had nothing to fear by testifying. Petitioners have "the burden of showing that [their] right to issuance of the writ is 'clear and indisputable.'" *Mallard v. United States District Court for the Southern District of Iowa,* 490 U.S. 296, 309, 109 S.Ct. 1814, 1822, 104 L.Ed.2d 318 (1989), *citing Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953), *and quoting United States v. Duell,* 172 U.S. 576, 582, 19 S.Ct. 286, 287–88, 43 L.Ed. 559 (1899). In this case, petitioners had the burden of establishing that Col. Naylor "unequivocally promised," with the implicit approval of his superiors, that they would not be prosecuted if they testified before the PACOM and PACAF boards. They have not met that burden.

### III. Use of the Statements

■ Having decided that petitioners do not have transactional immunity does not end the inquiry. It is clear from the record and undisputed by appellate government counsel that there were repeated conversations among Col. Naylor, Lt.Col. Lee, petitioners, and their counsel regarding petitioners' testimony. Whether those conversations are characterized as unwarranted assurances, cajoling, unsolicited advice, or outright pressure, the result was the same: it influenced the advice given by petitioners' counsel and overcame the reluctance of petitioners to testify. Col. Naylor's repeated assurances neutralized the Article 31(b), UCMJ, 10 USC § 831(b), warnings given by the investigating boards. We regard Col. Naylor's and Lt.Col. Lee's repeated conversations with petitioners regarding their testimony before the PACOM and PACAF boards as "unlawful influence" within the meaning of Article 31(d). *Cf. United States v. Churnovic,* 22 MJ at 408 (promise of use immunity constitutes

" 'unlawful inducement' for purposes of Article 31(d)").

The impact of unlawful influence goes beyond the admissibility of the statement. We will not allow a prosecution which resulted from a statement obtained in violation of Article 31(d). *See United States v. Kimble*, 33 MJ at 291 (prosecution not permitted if it arose because of unlawfully induced confession). In this case, we cannot determine from the record whether the decision to prosecute petitioners was based wholly or in part on their testimony before the PACOM and PACAF boards. We will permit prosecution to proceed only if the Government shows, by a preponderance of the evidence, that the evidence against petitioners is untainted by their testimony before the PACOM and PACAF boards and, further, that the decision to prosecute was untainted by their testimony. *Kastigar v. United States*, 406 U.S. 441, 460–61, 92 S.Ct. 1653, 1664–65, 32 L.Ed.2d 212 (1972).

The petition for extraordinary relief in the nature of a writ of mandamus and a writ of prohibition is granted to the following extent. The charges are dismissed without prejudice. The convening authority may either terminate the prosecution or transmit the case file to another general court-martial convening authority for a determination whether charges should be preferred. The new convening authority may either terminate the prosecution or he may designate a member of his command to review the case file after removing petitioners' statements, all references to them, and all evidence derived from them, to determine whether charges are warranted. The current trial counsel will be relieved from any further duties in connection with this case. His case files and notes will be sealed and he will have no contact with prosecutorial authorities regarding this case. If charges are preferred, the Government will have the burden of showing, by a preponderance of the evidence, that any evidence presented in support of those charges is untainted by petitioners' statements.

COX, Judge (concurring):

For the reasons I expressed in *United States v. Kimble*, 33 MJ 284, 293 (CMA 1991) (Cox, J., dissenting), I join the principal opinion.

CRAWFORD, Judge (concurring):

This Court may grant relief using its extraordinary power under the All Writs Act, 28 USC § 1651(a), when the relief would "be: (1) in aid of jurisdiction and (2) agreeable to the usages and principles of law." *Lemoine v. Baker*, 36 MJ 86, 88 (CMA 1992)(Crawford, J., dissenting). There is no question here that the first prong is satisfied. Based upon the Government's concession at oral argument, I agree that the second prong is also satisfied under the circumstances of this case.

SULLIVAN, Chief Judge (concurring in part and dissenting in part):

Today, the principal opinion does not overrule *Cooke v. Orser*, 12 MJ 335 (CMA 1982); rather it inadvertently ignores this case and its due process approach to the question of broken immunity promises. Its preoccupation with the one-judge opinion of *United States v. Churnovic*, 22 MJ 401 (CMA 1986), and its *"de facto* immunity" analysis overlooks the realities of military life and the importance of integrity in command. Moreover, I note that Senior Judge Everett, himself the author of *Churnovic*, more recently affirmed the due process approach of *Cooke v. Orser, supra*, in the majority opinion of this Court in *United States v. Kimble*, 33 MJ 284, 293 (CMA 1991). Accordingly, I cannot join this part of the principal opinion.

The critical issue before this Court is not one of fact but one of law. *See* Art. 67(c), Uniform Code of Military Justice, 10 USC § 867(c)(1989). It is whether the Constitution and the Code require military authorities to act in accordance with the law when they institute criminal proceedings against servicemembers at courts-martial. *Cooke v. Orser, supra*, clearly established that it is the legal duty of a convening authority

and his surrogates to act in a forthright and unambiguous manner when offering immunity to a servicemember in exchange for investigative cooperation. Moreover, it held that, when the desired cooperation is provided by the suspect servicemember, as in this case, quibbling or reneging by these military officers will not be tolerated. Since the principal opinion and all parties agree that this precise communication problem existed in petitioners' cases, I conclude that they were denied due process of law and that their petition should be granted in full.

Turning next to the *"de facto* immunity" analysis employed by the principal opinion, I also disagree with its application and conclusion. It holds that petitioners did not clearly and indisputably "establish[ ] that Col. Naylor 'unequivocally promised' ... that they would not be prosecuted if they testified before the PACOM and PACAF boards." 36 MJ at 101. In recounting its facts tending to support this conclusion, it ignores the specific findings of fact made by the judge at trial and the concessions of the Government to the contrary.

In addition to the findings of fact noted by the principal opinion, the military judge also found as follows:

25. CAPT Gehlke and CAPT Cunningham, as well as their counsel, were aware the Navy investigation was being conducted by RADM Perkins, COL Naylor's senior. They were also aware COL Moomaw's investigation was conducted under the authority of Air Force commands.

26. *CAPT Gehlke, CAPT Cunningham and their counsel reasonably believed Marine Barracks, Guam, would not initiate disciplinary action against either officer as a result of the training accident or related events. They believed any disciplinary action would be coordinated through COL Naylor.*

27. Neither CAPT Gehlke nor CAPT Cunningham were ever directly told by either COL Naylor or LCOL Lee that they would not be court-martialed; that they were granted immunity for any

statements to the investigations; or that any assurances or promises of immunity from prosecution had been obtained from any general court-martial convening authority.

28. *Both CAPT Gehlke and CAPT Cunningham and their counsel believed Marine Barracks would not initiate disciplinary action.*

(Emphasis added.)

Moreover, the Government conceded before us that at least some type of "no prosecution" promise was made to petitioners and their counsel. The Government advised this Court:

The Government does not entirely agree with the determination of the trial judge that the petitioners could not have reasonably have [sic] construed the assurances they received from their commanding officer that they would not be prosecuted for any offense arising out of the transaction (the training exercise) as an effective grant of immunity because the commanding officer of the Marine Corps Barracks, Guam (hereinafter "Barracks"), lacked the requisite authority in his own right. Under this Court's precedents in *United States v. Kimble,* 33 MJ 284 (CMA 1991), *United States v. Churnovic,* 22 MJ 401 (CMA 1986), and *Cooke v. Orser,* 12 MJ 335 (CMA 1982), Colonel Naylor may well have had apparent disposition authority over the only offenses he thought, on the basis of the accounts he had heard from the accused petitioners themselves, could conceivably have been committed—negligent dereliction of duties. *The promises he undoubtedly extended* were based on his assumption, reasonable enough, that he knew the truth and the truth would set them free, or at least, release his officers from the threat of court-martial.

Answer to Order to Show Cause at 10 (emphasis added).

*Colonel Naylor's testimony* (R. 47–62) *is equivocal about the nature of the assurances he provided, taking apparent refuge in an imprecise recollection*

and general incoherence when pressed on the point. However, he admits that he was confident his officers had nothing to hide and therefore no reason to be concerned about immunity (R. 51–52), and that after each of the petitioners balked at testifying further upon being administered Article 31 warnings he reiterated his strong belief that they had nothing to worry about and should cooperate. (R. 53–54.) Colonel Naylor recalls repeated and extensive conversations with both Captains Gehlke and Cunningham on the subject of the training accident as he firmly believed it to be, as well as with both counsel. (R. 56–57.) After Gehlke was warned that he was considered a possible homicide suspect and reported this development back to his command, Colonel Naylor agrees reiterating his view that the "Barracks had nothing to hide" and that Gehlke had information critical to the process. (R. 58.) The one point upon which his testimony clashes sharply with the petitioners and the defense counsel who testified is in Naylor's insistence that he never exhorted the petitioners to go against the advice of their counsel. (R. 59.) The testimony of Lt. Debra Dawn Cooper, JAGC, USNR, (R. 73–74) and Lt. William D. Bunch JAGC, USNR, (R. 144) indicates that both Colonel Naylor and Lieutenant Colonel Lee exerted maximum efforts to persuade counsel to withdraw their opposition to their respective clients' testimony, an eagerness strongly corroborative of the account rendered by Captain Gehlke that depicts Colonel Naylor attempting to override Lt. Bunch's advice outside of counsel's presence. The military judge's factual determinations seem generally well supported in the record: the Government does not, therefore, take issue with them.

(Emphasis added.) The text of the Government's Answer continues as follows:

> Therefore, because of the tangled equities of this case, the Government agrees that Colonel Naylor's mistaken assurances were sufficient to overcome the initial reluctance of both petition-

ers to testify after they had been warned, and that that suffices to confer a type of equitable immunity with respect to those offenses, and those offenses alone, as to which Colonel Naylor retained apparent dispositional authority: the charges of dereliction and false official statement.

Answer at 13 (emphasis added).

The disagreement between the parties before this Court is as to the degree of transactional immunity granted to the petitioners in light of the commanding officer's authority as a special court-martial authority. In this context, the principal opinion's conclusion that the petitioners have not shown that *any* transactional immunity was granted to them is somewhat misplaced. Moreover, I further would find that *"de facto* immunity" existed in this case, *see United States v. Churnovic, supra* (Everett, C.J.), and RCM 704(c), Discussion, Manual for Courts–Martial, United States, 1984, because the facts of this case clearly and indisputably show that the petitioners, along with their legal counsel, had a reasonable and honest belief that no prosecution at all would be forthcoming.

In conclusion, I respectfully disagree with Part II of the principal opinion. In this case, the petitioners were suspects and were represented by military legal counsel. The facts show that they and their counsel received repeated representations from the senior Marine officer on Guam (Colonel Naylor) that if they told what happened to the boards of inquiry, no disciplinary action would take place. Military Judge's Findings of Fact 20, 36 MJ at 99, and 26, *id.* at 103 of this opinion. The Discussion to RCM 704(c) states:

> Under some circumstances a promise of immunity by someone other than a general court-martial convening authority may bar prosecution altogether.

We have also suggested in *United States v. Kimble,* 33 MJ 284, 293 (CMA 1991), that a special court-martial convening authority can similarly bind his superiors. On the basis of these facts, I disagree with the

principal opinion's refusal to grant petitioners' request for a "no prosecution" order. I agree with Part III and the rest of the principal opinion except to the extent that it permits any type of retrial of this case.

WISS, Judge (dissenting):

My reading of *United States v. Kimble*, 33 MJ 284 (CMA 1991), and *Cooke v. Orser*, 12 MJ 335 (CMA 1982)—the two principal cases among our decisional precedent in this area—leads me to these conclusions:

First, if an accused has an honest and reasonable belief that the official purporting to grant him immunity has the lawful authority to do so, due process requires that that promise of immunity be enforced.

Second, since "[o]nly a general court-martial convening authority may grant immunity," RCM 704(c), Manual for Courts-Martial, United States, 1984, such an honestly held belief is reasonable only where the official who purports to convey the immunity "has either expressed or implied authorization of the general court-martial convening authority" to make such a conveyance. *United States v. Kimble, supra* at 292, citing *United States v. Churnovic*, 22 MJ 401, 405 (CMA 1986), which in turn cited *United States v. Brown*, 13 MJ 253 (CMA 1982), and *Cooke v. Orser, supra.* This implied authorization might be reflected by such factors as the rank, position, and conduct of the officer in question, *see Cooke v. Orser, supra;* the apparent authority of the officer in question to make the determinative decision as to disposition of the potential charges as they then were known, *see United States v. Kimble, supra;* or others.

Third, if the accused's cooperation pursuant to such a grant of immunity leads to knowledge that offenses are involved that are much more serious than understood when the immunity was granted, due process nonetheless requires that the promise of immunity be enforced, *see* 33 MJ at 289–90—at least absent a showing of bad-faith deceit on the part of the accused, *see id.* at 290.

Applying these principles of law to the facts of this case, I conclude as follows:

First, petitioners *normally* would have been reasonable in believing that Colonel Naylor—as the special court-martial convening authority, the commander of the Marine Barracks on Guam, and the senior Marine on that island—had the apparent authority to make the dispositive decision on the potential charges as they were suspected early on, such as dereliction of duty; thus, petitioners *normally* would have been reasonable in believing that Colonel Naylor had the implied authorization of the general court-martial convening authority to convey a grant of immunity. *See United States v. Kimble, supra.*

Second, *if* petitioners had had such a reasonable belief, the fact that more serious charges subsequently came to light would not have defeated the efficacy of the grant of immunity, *see id.*

Third, on the other hand, petitioners knew that the general court-martial convening authority *here*—Rear Admiral Perkins—chaired one of the two investigative boards that formally were inquiring into the incident giving rise to these charges. Para. 25, Findings of Fact. Knowing this, *without more*, petitioners would *not* have been reasonable in concluding that Colonel Naylor had the disposition authority over potential charges and, thus, Admiral Perkins' implied authorization to grant immunity. My conclusion in this regard would be fully consistent with the military judge's findings of fact that petitioners "and their counsel reasonably believed Marine Barracks, Guam, would not *initiate* disciplinary action against either officer as a result of the training accident or related events" and that "[t]hey believed any disciplinary action *would be coordinated* through COL Naylor." *Id.* at para. 26 (emphasis added).

Fourth, however, there *was* more here. Petitioner Gehlke appeared before Admiral Perkins' board twice. The first time, he invoked his right to remain silent and did not testify; on that occasion, Gehlke found himself facing a cold, hostile environment.

Gehlke testified that, thereafter, he met with Colonel Naylor and informed him how hostile the board had been and how uncomfortable he had felt. Gehlke stated that Petitioner Cunningham and both their counsel also were present. When Gehlke was asked what Colonel Naylor had said on being told of the situation, he said the Colonel responded:

That when he spoke to the board, he would talk to them about the way we were being treated, sir.

Q. And to the best of your knowledge, did he talk to that board about that?

A. The Colonel told me that he did, sir.

Q. And what was the atmosphere like when you returned on 30 August 1991?

A. Much more cordial and relaxed, sir. I had Lieutenant Bunch with me, sir. The treatment was in stark contrast to the first time, sir.

Q. To the best of your knowledge and belief, had your Commanding Officer, Colonel Naylor, gone and talked to those investigators before you reappeared before them?

A. He had, sir.

Paragraph 23 of the military judge's Findings of Fact addresses this event as follows:

After again being advised of his rights and in the presence of counsel, CAPT Gehlke made a statement to RADM Perkins' investigation. The demeanor and attitude of the board members was dras-

tically changed from his first appearance. He attributed their more cordial approach to COL Naylor who had said he would inform the board their earlier handling of witnesses was unsatisfactory. . . .

All along, Colonel Naylor continually urged both petitioners and their counsel to be fully cooperative with the board, assuring that they would have nothing to worry about. In this light, then—considering Naylor's assurance that he would speak to the board about their approach to Gehlke, reenforced by the board's marked change in demeanor to one of cordiality—it *was* reasonable for petitioners to believe that Naylor *did* have the implied authorization of Admiral Perkins to dispose of any potential criminal charges and to grant immunity.

Fifth, therefore, petitioners have demonstrated that they had an honest and reasonable belief that Colonel Naylor had at least the implied authorization of the general court-martial convening authority to grant them immunity.

Accordingly, on the basis of the principles I have identified from our controlling precedent, as applied to the facts of this case, I would enforce that promise of immunity as a matter of due process and order dismissal of all charges against petitioners arising from the incident in question. *See United States v. Kimble* and *Cooke v. Orser*, both *supra, see* 36 MJ at 105.