David SAMPLES, Lieutenant,
U.S. Navy, Petitioner,

v.

Captain W.T. VEST, U.S. Navy, Navy–Marine Trial Judiciary, Tidewater Judicial Circuit, and the United States, Respondents.

**Misc. No. 94–8022.**

U.S. Court of Military Appeals.

Argued Nov. 9, 1993.

Decided Jan. 11, 1994.

For Petitioner: *Lieutenant David P. Sheldon*, JAGC, USNR (argued); *Lieutenant Alan D. Titus*, JAGC, USNR (on brief).

For Respondents: *Lieutenant Commander David B. Auclair*, JAGC, USN (argued); *Colonel T.G. Hess*, USMC and *Commander S.A. Stallings*, JAGC, USN (on brief).

*Opinion of the Court*

WISS, Judge:

This is a petition for extraordinary relief in the nature of writs of prohibition and mandamus. Petitioner is a Navy lieutenant who faces a general court-martial on a charge of indecent assault at the Tailhook Symposium ("Tailhook") of Navy and Marine Corps aviators in Las Vegas, Nevada, on September 7, 1991. Petitioner claims that he has been granted immunity from any prosecution arising out of the events at that conference and, accordingly, seeks dismissal of the charge now pending against him. He made a motion to that end at his court-martial, but the military judge denied it after extensive litigation. Upon his petition to this Court, we stayed further trial proceedings and ordered the Government to show cause why the requested relief should not be granted. 39 MJ 70 (1993). After the Government responded to our order, we heard oral argument in the cause.

We have carefully considered petitioner's argument that has been ably presented in his briefs and during the argument in this matter, as well as the Government's defense of its prosecution of petitioner. Additionally, we have scrutinized the record of the trial proceedings at which petitioner's motion was litigated. Now, we hold that, on the basis of the military judge's findings of fact, which are supported in the evidence of record, petitioner has not carried his burden of persuasion that he was given an enforceable promise of transactional immunity. *See United States v. Churnovic*, 22 MJ 401, 407 (CMA 1986)

(Everett, C.J.); *see also Cunningham v. Gilevich*, 36 MJ 94, 101 (CMA 1992).

I

The charge against petitioner that has been referred to general court-martial is based on an incident at Tailhook in which an intoxicated young woman was lifted into the air by apparently three officers and stripped of her clothing below the waist. This incident was but one small part of the extensive misconduct by dozens of officers that is alleged to have occurred at the now-infamous Tailhook.

When the light of day first focused on the unofficial activities at that conference, a variety of investigative efforts followed, including those by special agents of the Office of the Inspector General, Defense Criminal Investigative Services (DCIS). Ultimately, in connection with bringing these investigations to some point of closure, the Chief of Naval Operations (CNO) designated Vice Admiral Joseph P. Reason, Commander, Naval Surface Force, U.S. Atlantic Fleet, as the Consolidated Disposition Authority for all Tailhook cases involving Navy officers. In that capacity, Admiral Reason was given full disciplinary and convening authority under the Uniform Code of Military Justice over all officers under Tailhook investigation, regardless of those officers' duty assignments elsewhere.

One of the difficulties that investigators claimed they met from the outset was the wall of silence behind which all Tailhook attendees huddled. As Special Agent Matthew Walinski of DCIS explained: "We had been out for 9 months doing interviews where hundreds of naval aviators had said to us, 'I was standing next to my friend.' 'What's your friend's name?' 'I can't remember.'"

In an effort to crack the wall and to learn what really happened at Tailhook, DCIS suggested to Admiral Reason a scenario in which, one by one, investigative subjects who seemed to be lesser involved were sent to mast (*see* Art. 15, Uniform Code of Military Justice, 10 USC § 815) in front of Admiral Reason, where known

charges were disposed of; then immediately to the office of Captain Williams, the Force Judge Advocate for Admiral Reason, who advised the subjects of their post-mast rights; then immediately to Commander Robert Monahan, the Assistant Force Judge Advocate, who dated and delivered to the subjects a "Grant of Immunity" and an "Order to Testify" signed by Admiral Reason and who purported to explain those two documents to the subjects; then typically immediately to an office where DCIS agents interviewed the immunized officers. Petitioner was one of approximately 20 officers subjected to this assembly line, and what was said to him and by whom along the way is what forms the basis of this petition.

At each point along this route, petitioner stood alone, without either his military or civilian defense counsel at his side. Why defense counsel permitted such a situation is unexplained in the record; also unsatisfactorily explained is why no official who received petitioner at any point in this process was particularly concerned about petitioner's legal representation.

First stop was Admiral Reason's office. Petitioner's role, if any, in the indecent assault that is the subject of the instant court-martial also was one of the charges against him at mast. On the basis of petitioner's denial of involvement therein, however, Admiral Reason dismissed the mast as to that charge. Thereafter, petitioner's route along the assembly line proceeded.

Next stop was Captain Williams' office. There, according to petitioner's unrebutted trial testimony, Captain Williams referred to the dismissed indecent assault and remarked, "'Well, I think you got off because, in my personal opinion, I think you assaulted that woman and many other women.'" Thereafter, Captain Williams completed the post-mast paperwork and rights' advisement.

Next stop was Commander Monahan. In front of petitioner, Commander Monahan dated a "Grant of Immunity" and an "Order to Testify," each of which had already

been signed by Admiral Reason, and handed them to petitioner. The Grant of Immunity stated, in part:

2. In consideration of your testimony as a witness for the Government in the matters described in enclosure (1), you are hereby granted *immunity from the use of your testimony (or other information given by you or any other information directly or indirectly derived from such testimony or other information)* describing the events related in enclosure (1) against you in any criminal case, *except a prosecution for perjury, giving a false statement under the provisions of this grant of immunity, or otherwise failing to comply with an order to testify in this matter.*

3. It is understood that *this grant of immunity from the use of your testimony* ... against you in any criminal case is effective only upon the condition that you testify under oath as a witness for the Government.

(Emphasis added.) On the basis of this Grant of Immunity, the Order to Testify directed petitioner

to appear before agents of the Department of Defense Inspector General's Office and answer their questions fully and truthfully and to cooperate in any courts-martial, disciplinary hearings, or administrative hearings which might arise as a result of the above-captioned investigation. In accordance with section 6002, Title 18, United States Code, *no testimony or other information given by Lieutenant David Samples or any information directly or indirectly derived from such testimony or other information can be used against him in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with this order.*

(Emphasis added.)

Notwithstanding the apparent unambiguity of these documents, Commander Monahan then purported to "explain" to petitioner what they meant. The military judge found that, "although CDR Monahan's testimony was somewhat unclear as to the exact words that he used in explaining the nature of the grant of immunity and order to testify, ... nothing in CDR Monahan's explanation to the accused amounted to the express granting of transactional immunity." Essential Findings at 12. Earlier, though, the military judge had found that Commander Monahan had "explained to the accused that if he would give a complete account of the events of the evening of 07 September 1991, that he would not be prosecuted." Essential Findings at 8. A reading of the entirety of the 57 record pages of Commander Monahan's testimony cannot help but leave uncertainty as to whether his "explanation" of the seemingly clear grant of testimonial immunity effectively blurred the legal distinction between it and the broader concept of transactional immunity. *See* RCM 704(a), Manual for Courts–Martial, United States, 1984.

After the explanation, Commander Monahan directed petitioner to read both documents. The military judge found that, in fact, "[t]he accused did read both documents and he acknowledged his understanding of the content of each document." Essential Findings at 8. Of decisional importance to our action on this petition, the military judge found as fact that Commander Monahan's "partial misstatement of the law" as to the nature of the immunity "was understood by the accused in the context of the written grant of testimonial immunity and did not supersede the limits of that immunity ... In short, the accused understood that the grant of immunity extended only to any testimony or statements made by him." Essential Findings at 12.

Next stop, the following day, was Special Agent Walinski—to whom petitioner was hand-delivered by Commander Monahan. The military judge found that "Agent Walinski initially explained to the accused that 'if he told the truth about the events ... of Saturday, 07 September 1991, his case would become a "wash-out" and that he would no longer have to worry about being prosecuted,' or words to that effect." Essential Findings at 8. This explanation was entirely consistent with Agent Walinski's

testimony as to the thinking that led to this whole procedure:

> We felt that, or the Director, DCIS felt that it was one of the ways that we could have a resolution in the case and be fair to everybody that was involved in [the] case, so that they could have a walk-away, as we called it. It was their opportunity to come in, tell us the truth, tell us everything that they knew that went on there, and then have the ability to walk away from it and know that they could go on with their naval career and not have Tailhook, you know, hanging over them for any length of time.

Finally, there was an unscheduled stop on this assembly line. Later the same day as was his interview with Agent Walinski, petitioner was interviewed by Lieutenant Commander Lyman Ritter, Jr., who was the prosecutor in two other Tailhook cases. He knew that petitioner had been immunized, and he was interested to see if petitioner had any information that might help those cases. Under questioning by civilian defense counsel, Ritter had this to say about his discussion with petitioner regarding the latter's immunity:

> Q. Or do you remember what you told him?
> A. I don't remember word for word, but I—I several times stressed to him that at this point he wasn't suspected of anything, that if he, you know, if he felt intimidated or anything by any of the process up to that point, I know he just finished Admiral's Mast, and I figured he probably would be a little intimidated after that, that—that there is nothing to worry about at this point, we're not after anything—we believe we've heard [w]hat there is to know about what you've done. *If there's more, well, you've got immunity and at this point you can tell us anything that happened and, as long as you're honest, there's no problem. The only problem you can get into is if you make false statements.* So just tell us the truth.
> Q. So, you told him basically to—to give you whatever information he had and

there would be no problem, that he wouldn't be pr—I mean, did you say that he wouldn't be prosecuted?
> A. I didn't say that. I said, if you gave a false statement, that's the only thing you've got to worry about. At this point you don't, you know——
> MJ: Well, worry about in what respect?
> WITNESS: Well, the possibility of prosecution or any sort of disciplinary action, you know——
> MJ: Well, that was the question I asked.
> WITNESS: I'm sorry.
> Q. *Okay. So, I mean, you told him that you don't have to worry about prosecution or disciplinary action as long as you're telling the truth?*
> A. *That's right.*

(Emphasis added.) Even though this testimony might be construed much more broadly, the military judge found: "CDR Ritter explained to the accused that he would be giving a statement under a testimonial grant of immunity, and that the accused could not be prosecuted for any statement that he made to him. This advice was acknowledged by the accused." Essential Findings at 10.

For his part, petitioner's testimony as to what was said and what he understood it to mean—especially by Commander Monahan—was somewhat inconsistent. At some points, he quite forthrightly explained his understanding to be that nothing he said could ever be used against him unless he lied. For instance:

> And he [Commander Monahan] gave me the—I was reading the grant of immunity and he explained to me that the grant of immunity basically was that, as long as I didn't perjure myself, whatever I said wouldn't be used to prosecute me. And that was it.

> \*       \*       \*

> The way that occurred· was he [Lieutenant Commander Ritter] asked me, he says, "Now, are you aware of what the grant of immunity means?" and I briefed him as to what Commander Monahan had said to me, the same words again. I

said, "What it means in the way I was briefed by Commander Monahan" I said "was, as long as I don't perjure myself, that anything I say will not be used to prosecute me. . . .

\* \* \*

WITNESS: That, as long as I didn't—I was supposed to be truthful and forthright to the DOD investigators and that, as long as I didn't perjure myself, then nothing would be used against me for prosecution.

Q. When you say nothing could be used against you, you mean nothing that you said, correct?

A. Anything that I said.

Q. What if——

A. He used those words. I don't recall him ever using those words but——

Q. That's fine. But your impression clearly was then that Commander Monahan explained the documents to you to mean that anything you said to investigators or anyone else under your grant couldn't be used against you unless, as you said, the conditions of perjury or false statement might be met.

A. Unless I didn't tell the truth, that's correct, sir.

At other points, however, he claimed an understanding of a broader immunity—that, "as long as" he "told the truth," he was free of any and all prosecution for Tailhook events. The ambiguity was pointedly addressed in the following exchange between trial counsel and petitioner:

Q. Commander Monahan never told you that you couldn't be prosecuted for anything that might have happened at Tailhook if evidence came from some other source, did he?

A. No, he did not.

\* \* \*

Q. Again, Commander Ritter didn't tell you that you could not be prosecuted for anything that happened while you were at Tailhook, did he?

A. No, he didn't say anything. Neither him [sic] nor Commander Monahan said anything about further prosecution.

Q. From other independent evidence?

A. No, sir.

Q. Just from the use of your testimony, correct?

A. Yes, sir.

Resolving this inconsistency in the context of the other evidence, the military judge found as fact that "the accused by his own account was not misled by CDR Monahan concerning the nature of the grant of immunity." Essential Findings at 12. As to his subsequent interview with Agent Walinski, petitioner testified that Walinski did not discuss with him the grant of immunity, thus obviously negating any arguable reliance by petitioner on any misleading statements that Agent Walinski might have made.

## II

This Court, as recently as the decision in *Cunningham v. Gilevich, supra* at 100, has recognized that only a general court-martial convening authority may grant either "transactional" or "testimonial" (or "use," *see* RCM 704(a)(2), Discussion), immunity.[1] That power may not be delegated and, when exercised, must be in writing. RCM 704(c) and (d). Here, Admiral Reason, as the appropriate general court-martial convening authority under the CNO's designation as Consolidated Disposition Authority, properly granted petitioner testimonial or use immunity in one of the written documents that Commander Monahan handed to petitioner following mast.

Petitioner, though, argues that, in fact, he was promised a more far-ranging transactional immunity—immunity from any prosecution for any conduct at Tailhook. Mainly, the basis for his claim is Commander Monahan's purported "explanation" of the document to be a grant of that inclusive protection.

■ We have recognized that, "in certain situations falling short of a formal *de jure*

---

**1.** *Compare* RCM 704(a)(1) *with* RCM 704(a)(2), Manual for Courts–Martial, United States, 1984.

grant of immunity" as described above, *see* 36 MJ at 100, transactional immunity might be granted *de facto*. *See, e.g., United States v. Kimble*, 33 MJ 284, 289–90 (CMA 1991); *see also United States v. Palumbo*, 897 F.2d 245, 248 (7th Cir.1990). Where an accused honestly and reasonably believes that an official has promised him transactional immunity and that official has the lawful authority to do so, then the promise is the functional equivalent of a grant of immunity. *See id. Cf. Cunningham v. Gilevich, supra; United States v. Quintanilla*, 2 F.3d 1469, 1483 (7th Cir.1993); *United States v. Streebing*, 987 F.2d 368, 372–73 (6th Cir.1993). Due process requires that such a promise be enforced. *United States v. Kimble, supra* at 289–90; *see Cooke v. Orser*, 12 MJ 335 (CMA 1982); *see generally United States v. Gerant*, 995 F.2d 505, 508 (4th Cir.1993).

The assembly-line technique in this case that merged and blurred investigative and justice procedures is troublesome. At best, it reflects a most curiously careless and amateurish approach to a very high-profile case by experienced military lawyers and investigators. At worst, it raises the possibility of a shadiness in respecting the rights of military members caught up in a criminal investigation that cannot be condoned.

Where were the defense lawyers during all of this?[2] Why would seasoned military lawyers like Captain Williams and Commander Monahan not ensure that petitioner's lawyers were at hand just to make sure that, as a practical matter, no problems ensued? Why would a seasoned lawyer like Commander Monahan deliver and "explain" a grant of immunity to petitioner, alone with him in a room, with no one else present to witness what was said and done? In fact, why would a seasoned lawyer like Commander Monahan take it upon himself to "explain" the grant of immunity in the first place? After all, it was clear and unambiguous; and any "explanation"

of it to the grantee most logically should come from his own lawyer, rather than from a lawyer at the center of the investigative/prosecutorial effort.

The confusion of investigative and justice functions incident to this exercise had the potential for jeopardizing this prosecution. It gave rise to a scenario in which it arguably might be concluded that a belief by petitioner that Commander Monahan had granted him transactional immunity and that he had the authority to do so was reasonable.

■ Nonetheless, such a belief also had to be honest, if petitioner now is to hold the Government to the promise. The military judge found as a matter of fact that petitioner was not misled by Commander Monahan and that petitioner fully understood that the grant of immunity was limited to use of his statements. That finding is fairly supported by the evidence of record and, thus, is not clearly erroneous. *See* S. Childress & M. Davis, 1 *Federal Standards of Review* §§ 2.01 at 2–6 and 2.02 at 2–7 to 2–9 (2d ed.1992).

Further, without addressing whether petitioner could have reasonably relied upon a promise by Lieutenant Commander Ritter or Agent Walinski, petitioner's testimony itself makes it clear, again, that he did not honestly perceive such a promise. He testified that Lieutenant Commander Ritter never promised him that no prosecution would occur based on evidence independent of petitioner's own statements, and petitioner did not remember at all any representations regarding his immunity during his interview by Agent Walinski.

Accordingly, we conclude that, as a matter of law, petitioner is not entitled to invoke transactional immunity as a bar to his pending court-martial.

## III

The petition for extraordinary relief in the nature of writs of prohibition and man-

---

**2.** We do not decide whether RCM 305(e) required that petitioner's counsel be given notice of any questioning and opportunity to be present; that would not affect our decision here whether petitioner has carried his burden of demonstrating an enforceable grant of transactional immunity.

damus is denied. The stay in the court-martial proceedings is dissolved when this opinion becomes final.

Chief Judge SULLIVAN and Judge COX concur.

CRAWFORD, Judge (concurring in the result):

I respectfully concur in the result of the majority opinion.

This Court may grant relief using its extraordinary power under the All Writs Act, 28 USC § 1651(a), when the relief would "be: (1) in aid of jurisdiction and (2) agreeable to the usages and principles of law." *Lemoine v. Baker*, 36 MJ 86, 88 (CMA 1992) (Crawford, J., dissenting). . . . *Cunningham v. Gilevich*, 36 MJ 94, 102 (CMA 1992) (Crawford, J., concurring). In this case the Government did not object to our jurisdiction under the All Writs Act.

I concur with the holding of the majority opinion that "on the basis of the military judge's findings of fact, which are supported in the evidence of record, petitioner has not carried his burden of persuasion that he was given an enforceable promise of transactional immunity." 38 MJ at 482. However, I disagree with the dicta of the majority opinion that purports to elevate what I consider to be dicta in *Cunningham* to a holding that there may be grants of *de facto* immunity in the military. 38 MJ at 486–87. See *United States v. Kimble*, 33 MJ 284, 293–94 (CMA 1991) (Cox, J., dissenting).

GIERKE, Judge (concurring in the result):

I am uncomfortable with the majority's decision to uphold the military judge's finding "as a matter of fact that petitioner was not misled by Commander Monahan and that petitioner fully understood that the grant of immunity was limited to use of his statements." 38 MJ at 487. I have difficulty holding that the military judge's finding was "fairly supported by the evidence of record," in light of Commander Monahan's testimony and LT Samples' contradictory responses regarding his understanding of the extent of his immunity. I believe that the only finding justified by the record before us is a finding that LT Samples was confused.

Nevertheless, LT Samples' confusion about the terms of his immunity does not affect the outcome in this case. Unlike previous cases decided by this Court, this case did not involve a negotiated disposition of charges against an accused. See *United States v. Kimble*, 33 MJ 284 (CMA 1991) (promise not to prosecute if accused entered therapy program); *United States v. Churnovic*, 22 MJ 401 (CMA 1986) (promise not to prosecute for possessing hashish if accused revealed its location); *Cooke v. Orser*, 12 MJ 335 (CMA 1982) (promise not to prosecute if accused fully disclosed his involvement with Soviet agents and passed a polygraph examination).

All known charges against LT Samples had been disposed of at the admiral's mast on June 2, 1993, which preceded the grant of immunity, order to testify, and subsequent interview by law enforcement agents. This case does not require us to enforce an agreement regarding the preferral or disposition of charges, because there was no such agreement. Regardless whether LT Samples thought he received transactional or testimonial immunity, he was presented with a lawful order to testify, and he had no choice but to obey. This order to provide evidence requires us only to determine the consequences of LT Samples' compliance with that order. The grant of immunity was not promised in consideration of LT Samples' cooperation, but rather was issued to put teeth in the order to testify by removing any right to claim a privilege against self-incrimination. See *United States v. Kirsch*, 15 USCMA 84, 35 CMR 56 (1964) (recognizing convening authority's power to grant immunity and to prosecute for wrongful refusal to testify.)

Because this case involves an order rather than a negotiated agreement, I disagree with the majority's implication that there was something inappropriate about the failure to involve LT Samples' counsel in the

grant of immunity, order to testify, and subsequent interviews by prosecutorial officials. On the other hand, I agree with the majority that, had LT Samples' counsel been involved, the present litigation probably would not have arisen.

Finally, I note that there has been no attempt to use LT Samples' exculpatory statement against him. Furthermore, the decision to prosecute was not derived from his exculpatory statement but from the statement of LT Truong, independently obtained by law enforcement agents 4 days after LT Samples was interviewed.

For the foregoing reasons, I agree with the majority that LT Samples is not entitled to transactional immunity. Accordingly, I concur in the result.